IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON
DIVISION THREE

| | | |
|---|---|---|
| YVONNE A.K. JOHNSON, | ) | No. 31837-1-III |
| | ) | |
| Appellant, | ) | |
| | ) | |
| v. | ) | PUBLISHED OPINION |
| | ) | |
| JAMES P. RYAN, | ) | |
| | ) | |
| Respondent. | ) | |

LAWRENCE-BERREY, J. — James Ryan engaged in vitriolic Internet blogging against Yvonne Johnson. Johnson sued Ryan for defamation and tortious interference with business expectancy. Ryan defended the suit, in part, by asserting the anti-SLAPP statute.[1] As permitted by that statute, Ryan filed a prediscovery motion to strike. He argued that Johnson's claims should be dismissed because his speech was protected speech in that his attacks against Johnson were matters of public concern. The trial court agreed and dismissed Johnson's claims. We hold that Johnson's blogging was primarily for personal concern, not public concern, and reverse the dismissal of Johnson's claims.

---

[1] Strategic Lawsuit Against Public Participation. RCW 4.24.510.

FACTS

As discussed later, we accept the facts and all reasonable inferences in the light most favorable to Yvonne Johnson, the party resisting the motion to strike.

The Spokane Civic Theatre (the Theatre) is a not-for-profit, performing arts theatre located in Spokane. The Theatre is a private foundation receiving support from private donors and operating with an endowment. On a donation web page, the Theatre notes:

> Revenue from programming covers only 50 percent of our operating costs.
> We depend on the support and commitment of our community to make up
> the essential difference.

Clerk's Papers (CP) at 29.

In 2005, the Theatre hired plaintiff Yvonne Johnson as its executive artistic director. Johnson is a highly acclaimed theatre veteran who was selected from scores of applicants. At the time of her hiring, the Theatre was on the cusp of financial ruin. By 2010, despite the economic recession, Johnson had doubled revenue for the Theatre. This economic feat was accomplished through a significant increase in ticket sales, expansion of the Theatre's training camp for children, and numerous fundraising endeavors. Johnson's financial acumen and ingenuity allowed the Theatre to expand its full-time staff by several positions, including a full-time music director.

On August 19, 2010, Johnson hired defendant James Ryan as full-time music

director for the Theatre. Ryan moved with his family from another state to Spokane. He understood the job had a three-year term.

Two months after the hiring, Johnson terminated Ryan's employment at the direction of the Theatre's board. Prior to Ryan's termination, the Theatre received an anonymous e-mail disclosing the nonmonogamous nature of Ryan's marriage, as well as Ryan's use of graphically nude photographs and texts while engaging in online sex solicitations. The Theatre also discovered that Ryan noted that he was employed by the Theatre and used his Theatre employee photograph in advertising for sex. According to Johnson, the Theatre learned that Ryan initiated some of his sexual solicitations while backstage on Theatre premises.

Johnson wrote a lengthy termination letter to Ryan. In summary, the letter noted that he was being terminated not because of his swinger lifestyle but because his coupling of his lifestyle with his employment at the Theatre had the potential for offending parts of the local community and thus reducing the Theatre's donations. Mr. Ryan admits that he posted a discreet listing on Craigslist for sex, although he denies that it included any information that identified his name or his employer. Rather, he contends that all identifying information was forwarded to the Theatre by an anonymous e-mailer, who in turn had received it from someone Mr. Ryan had met through Craigslist.

Being without a job, Ryan had time to obsess over his firing from the Theatre. On October 18, 2010, Ryan began a public campaign to discredit Johnson for terminating his employment. According to Johnson, the campaign began when Ryan sent an e-mail to her and posted the message on Facebook, although the e-mail is not part of the record. On October 24, 2010, Ryan began posting negative statements about Yvonne Johnson on the Internet via a blog entitled "thetyrannyofyvonne." Clerk's Papers (CP) at 99.

Ryan obtained the domain names of "spokanecivictheater.org" and "spokanecivictheatre.org." CP at 99. The Theatre's domain address was "spokanecivictheatre.com." The similarity in domain names caused confusion for those wishing to locate the Theatre's website. Anyone who mistakenly searched for the Theatre's website by utilizing one of his created addresses was immediately routed by Ryan's design to his sites. On April 29, 2011, Ryan began posting negative statements about Johnson on his two sites. In general, these blogs provide a lengthy chronology of Ryan's ongoing post-employment dispute with Johnson through various tribunals. This tedious chronology is set forth in some detail by the dissent. Within this tedious chronology is an isolated and vague reference that the Theatre board must be publicly held to account for failing to exercise its duties. This vague reference likely was to a wrongful discharge lawsuit that Ryan filed soon afterward against the Theatre.

4

Johnson alleges that Ryan sought to prevent her from gaining employment in the theater world. She cites a November 14, 2011 blog Ryan wrote:

> As I was writing this, it occurred to me that Civic is locked in a self-imposed catch-22. The longer the board fails to seek a resolution [to my employment dispute], the longer Civic is likely to be stuck with Yvonne A.K. Johnson. People have been talking for a year now about her desire to find a bigger, better job and move on from here—a scenario that has been fantasized about with no small amount of glee. If it is true that Ms. Johnson has been job hunting, one has to imagine that prospective employers have probably taken the time to Google Civic and her name. They are not likely to skip past the second search result, which is this site. (They might even just enter http://www.spokanecivictheatre.org, assuming that that would be the correct domain.) A few minutes spent reading this . . . is likely to induce a sense that Ms. Johnson would bring more drama and divisiveness than any respectable institution would care to have. So any fantasies you may have that Civic will soon be free of Ms. Johnson of her own accord are probably a bit unrealistic.

CP at 108.

In a similar vein, Ryan wrote in red letters at the beginning of a blog on February 8, 2013:

> If you have arrived at this page because you are considering Yvonne A.K. Johnson [for a job] please feel free to contact me. I would be happy to put you in contact with individuals [of] status within the community [who] would lend supporting testimony to what you will read [here. I can be] reached at civicdoodyspokane@gmail.com.

CP at 104.

Johnson also alleges that Ryan's blog attacks sought to coerce a financial settlement with the Theatre. In the same February blog, Ryan discussed a summary judgment ruling against him in the wrongful discharge lawsuit he filed against the Theatre. According to Ryan, prior to the dismissal of his lawsuit he offered to settle his case for one year's salary and moving expenses but now that his lawsuit was dismissed, the Theatre would be required to pay "serious money" to "end this thing." CP at 10. He also blogged that public ridicule is the only remedy for actions that fall into this category and this was their best chance to end this thing with a reasonable settlement and a nondisclosure.

## PROCEDURE

On April 5, 2013, Yvonne Johnson filed suit against James Ryan for intentional interference with business expectancy and defamation. Johnson sought damages and injunctive relief. In his amended answer, James Ryan sought dismissal of Johnson's complaint under RCW 4.24.525, the anti-SLAPP statute, together with an award of statutory damages and reasonable attorney fees.

On May 31, 2013, Ryan brought a motion to strike, pursuant to RCW 4.24.525. Ryan argued that his online postings simply provided a public forum for discussion and dissemination of commentary, complaints, and general information related to the Theatre.

6

He asserted that his online cyber-conduct addressed matters of public concern, evidenced by Internet traffic the blog purportedly received. Ms. Johnson countered that the postings were merely a private concern and not protected by the statute.

The trial court granted Ryan's motion after concluding that Ryan's online blogging activity addressed speech on a matter of public concern. The trial court awarded Ryan $10,000 in statutory damages and $8,358.40 in reasonable attorney fees and costs. Johnson appealed.

## LAW AND ANALYSIS

In 1989, Washington adopted the nation's first anti-SLAPP law, still codified under RCW 4.24.500 to .520. The law, known as the Brenda Hill Bill, provides immunity from civil liability for claims based on good-faith communication with the government regarding any matter of public concern. Tom Wyrwich, *A Cure for a "Public Concern": Washington's New Anti-SLAPP Law*, 86 WASH. L. REV. 663, 669 (2011). The Brenda Hill Bill was not without defect, since it did not provide a method for early dismissal. *Id.* With courts unable to dismiss SLAPPs before discovery, defendants had no means of escaping the significant legal expenses SLAPPS purposefully inflicted. *Id.* at 669-70.

In March 2010, the Washington Legislature passed its Act Limiting Strategic Lawsuits Against Public Participation. LAWS OF 2010, ch. 118, § 4. The Washington Act

protects the free expression of Washington citizens by shielding them from meritless lawsuits designed only to incur costs and chill future expression. Wyrwich, *supra*, at 663.

The 2010 Washington Act contains a declaration of purpose:

> (1) The legislature finds and declares that:
> (a) It is concerned about lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances;
> (b) Such lawsuits, called "Strategic Lawsuits Against Public Participation" or "SLAPPs," are typically dismissed as groundless or unconstitutional, but often not before the defendants are put to great expense, harassment, and interruption of their productive activities;
> (c) The costs associated with defending such suits can deter individuals and entities from fully exercising their constitutional rights to petition the government and to speak out on public issues;
> (d) It is in the public interest for citizens to participate in matters of public concern and provide information to public entities and other citizens on public issues that affect them without fear of reprisal through abuse of the judicial process; and
> (e) An expedited judicial review would avoid the potential for abuse in these cases.
> (2) The purposes of this act are to:
> (a) Strike a balance between the rights of persons to file lawsuits and to trial by jury and the rights of persons to participate in matters of public concern;
> (b) Establish an efficient, uniform, and comprehensive method for speedy adjudication of strategic lawsuits against public participation; and
> (c) Provide for attorneys' fees, costs, and additional relief where appropriate.

LAWS OF 2010, ch. 118, § 1.

This declaration of purpose evidences the legislative goals of balancing the rights of both plaintiffs and defendants, yet allowing expedited judicial review and dismissal of those defamation claims brought abusively for the primary purpose of chilling protected public speech. The legislature directed courts to apply and construe the Act "liberally to effectuate its general purpose of protecting participants in public controversies from an abusive use of the courts." LAWS OF 2010, ch. 118, § 3.

The new addition to Washington's anti-SLAPP laws is codified at RCW 4.24.525. RCW 4.24.525(4)(a) allows a party to bring a special motion to strike any claim that is based on an "action involving public participation and petition." Section 4 of the statute outlines the procedure to follow to respond to a SLAPP suit. The section provides:

> (4)(a) A party may bring a special motion to strike any claim that is based on an action involving public participation and petition, as defined in subsection (2) of this section.
> (b) A moving party bringing a special motion to strike a claim under this subsection has the initial burden of showing by a preponderance of the evidence that the claim is based on an action involving public participation and petition. If the moving party meets this burden, the burden shifts to the responding party to establish by clear and convincing evidence a probability of prevailing on the claim. If the responding party meets this burden, the court shall deny the motion.
> (c) In making a determination under (b) of this subsection, the court shall consider pleadings and supporting and opposing affidavits stating the facts upon which the liability or defense is based.

RCW 4.24.525.

> In deciding an anti-SLAPP motion, a court must follow a two step process. A party moving to strike a claim has the initial burden of showing by a preponderance of the evidence that the claim targets activity "involving public participation and petition," as defined in RCW 4.24.515(2). *U.S. Mission Corp. v. KIRO TV, Inc.*, 172 Wn. App. 767, 782-83, 292 P.3d 137, *review denied*, 177 Wn.2d 1014, 302 P.3d 181 (2013). If the moving party meets this burden, the burden shifts to the responding party "to establish by clear and convincing evidence a probability of prevailing on the claim." RCW 4.24.525(4)(b). If the responding party fails to meet its burden, the court must grant the motion, dismiss the offending claim, and award the moving party statutory damages of $10,000 in addition to attorney fees and costs. RCW 4.24.525(6)(a)(i), (ii).

*Davis v. Cox*, 180 Wn. App. 514, 528, 325 P.3d 255 (2014) (quoting *Dillon v. Seattle Deposition Reporters, LLC*, 179 Wn. App. 41, 67-68, 316 P.3d 1119, *review granted*, 180 Wn.2d 1009, 325 P.3d 913 (2014)).

Because RCW 4.24.525 provides an expedited summary judgment procedure, courts apply summary judgment standards when ruling upon RCW 4.24.525 motions to strike: "'[T]he trial court may not find facts, but rather must view the facts and all reasonable inferences in the light most favorable to the plaintiff.'" *Davis*, 180 Wn. App. at 528 (quoting *Dillon*, 179 Wn. App. at 90). In addition, we review the grant or denial of an anti-SLAPP motion de novo. *Dillon*, 179 Wn. App. at 70; *City of Longview v. Wallin*, 174 Wn. App. 763, 776, 301 P.3d 45, *review denied*, 178 Wn.2d 1020, 312 P.3d 650 (2013).

10

"PUBLIC PARTICIPATION" UNDER ANTI-SLAPP STATUTE

RCW 4.24.525(2) identifies the communications protected by the statute.

Subsections (a) through (c) involve communications to government. Subsections (d)

and (e) involve speech in other contexts. RCW 4.24.525 reads, in relevant part:

> (2) This section applies to any claim, however characterized, that is
> based on an action involving public participation and petition. As used in
> this section, an "action involving public participation and petition" includes:
> . . . .
> (d) Any oral statement made, or *written statement* or other document
> submitted, in a place open to the public or a public forum in connection
> with an issue of public concern; or
> (e) Any *other lawful conduct* in furtherance of the exercise of the
> constitutional right of free speech in connection with an issue of public
> concern.

(Emphasis added). Because this case concerns "written statements" instead of

"other lawful conduct," our review of the lower court's dismissal is limited to

RCW 4.24.525(2)(d). We, therefore, next examine the "public forum" and "public

concern" requirements of RCW 4.24.525(2)(d).

Public Forum. Courts have readily found that the Internet is a public forum.

*ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 113 Cal. Rptr. 2d 625 (2001).

*Hatch v. Superior Court*, 80 Cal. App. 4th 170, 201, 94 Cal. Rptr. 2d 453 (2000) noted

that Internet communications are "classical forum communications."

11

Public Concern. Because the California anti-SLAPP statute serves as a model for the Washington Act, some authorities have applied the borrowed statute rule to interpret the Washington Act. *See Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. 591, 599, 323 P.3d 1082 (2014); *Fielder v. Sterling Park Homeowners Ass'n*, 914 F. Supp. 2d 1222, 1231 n.4 (W.D. Wa. 2012); *Aronson v. Dog Eat Dog Films, Inc.*, 738 F. Supp. 2d 1104, 1110 (W.D. Wa. 2010). "Under the borrowed statute rule, courts find that when the legislature borrows a statute from another jurisdiction, it implicitly adopts that jurisdiction's judicial interpretations of the statute." Wyrwich, *supra*, at 690. However, California's statute uses the phrase, "public interest," whereas Washington's statute uses the phrase, "public concern." "[W]here the legislature modifies or ignores a provision of the borrowed statute, it implicitly rejects that provision and its corresponding case law." *Id.* "The Washington State Supreme Court has found that when the legislature deviates from a model act, it is 'bound to conclude' that the deviation 'was purposeful' and evidenced an intent to reject those aspects of the model act." *Id.* (citing *State v. Jackson*, 137 Wn.2d 712, 723, 976 P.2d 1229 (1999)). We also note that both Washington and federal authorities have defined "public concern" in the context of defamation law. Accordingly, when determining whether speech or conduct is of "public concern," Washington courts should focus on well-developed Washington and federal decisional

law rather than California decisions.[2]

Speech is of public concern when it can "'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Davis*, 180 Wn. App. at 531 (quoting *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1216, 179 L. Ed. 2d 172 (2011)). For purposes of analyzing federal authorities, *Alaska Structures* quotes *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132, 2 Cal. Rptr 3d 385 (2003):

> First, "public interest" does not equate with mere curiosity. (*Time, Inc. v. Firestone*, [424 U.S. 448, 454-55, 96 S. Ct. 958, 47 L. Ed. 2d 154 (1976)]; *Briscoe v. Reader's Digest Association Inc.*, (1971) 4 Cal.3d 529, 537 [93 Cal.Rptr. 866, 483 P.2d 34].) Second, a matter of public interest should be something of concern to a substantial number of people. (*Dun & Bradstreet v. Greenmoss Builders*, [472 U.S. 749, 762, 105 S. Ct. 2939, 86 L. Ed .2d 593 (1985)].) Thus, a matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. (*Ibid.*; *Hutchinson v. Proxmire* (1979) 443 U.S. 111, 135 [61 L.Ed.2d 411, 431, 99 S.Ct. 2675].) Third, there should be some degree of closeness between the challenged statements and the asserted public interest. (*Connick v. Myers* (1983) 461 U.S. 138, 148-149 [75 L.Ed.2d 708, 720-721, 103 S.Ct. 1684]); the assertion of a broad and amorphous public interest is not sufficient. (*Hutchinson v. Proxmire*, *supra*, 443 U.S. at p. 135 [61 L.Ed.2d at p. 431]). Fourth, the focus of the speaker's conduct should be the public interest rather than a mere effort "to gather

---

[2] In a very recent decision interpreting RCW 4.24.525, our Supreme Court stated that the Washington and California statutes had similarities but also "significant differences," the legislative purpose of the Washington and California statutes is different, and "[o]ur legislature thus phrased its findings more narrowly than California's." *Henne v. City of Yakima*, 341 P.3d 284, 289 (2015).

> ammunition for another round of [private] controversy . . . ."
> (*Connick v. Myers, supra*, 461 U.S. at p. 148 [75 L.Ed.2d at p. 721].)
> Finally, "those charged with defamation cannot, by their own
> conduct, create their own defense by making the claimant a public
> figure." (*Hutchinson v. Proxmire, supra*, 443 U.S. at p. 135 [61
> L.Ed.2d at p. 431].)

*Alaska Structures*, 180 Wn. App. at 602-03.

Our own courts have discussed the meaning of "public concern" in the context of free speech rights. In *White v. State*, 131 Wn.2d 1, 929 P.2d 396 (1997), the court held that the challenged speech was a matter of public concern. There, Judy White was a secretary/clerk typist at a state-run nursing home. *Id.* at 4-5. After being so employed for several years, the nursing home hired Evelyn Blanchard to be the director of nursing services. *Id.* at 5. The working relationship was often strained between White and Blanchard. In 1988, a resident of the home became very disruptive and behaved in a way that might harm himself and others. *Id.* Eventually, Blanchard directed that the resident be placed in a restraint jacket. *Id.* The jacket was in place for a couple hours until the home's medical director refused to sign an order permitting its use. Ultimately, White filed an incident report alleging that Blanchard committed patient abuse in authorizing the use of the jacket. *Id.* at 6. After an outside investigation, the allegation was dismissed. Soon after, White was transferred to a different facility. Unbeknownst to her, the transfer had been contemplated months before the incident report. White sued for wrongful

14

transfer. The trial court granted the home's summary judgment motion. On appeal, our high court affirmed the dismissal on causation grounds. Prior to reaching causation, however, the court held:

> Whether an employee's speech addresses a matter of public concern is determined by the content, form and context of the statement, as revealed by the whole record. *Connick*, 461 U.S. at 147-48. Content is the most important factor.
>
> The content of White's speech—suspected abuse of a nursing home patient—involves an issue of public concern. The public concern over proper care of vulnerable nursing home patients is reflected in RCW 70.124, a statute which requires nursing home employees to report alleged abuse or mistreatment of nursing home patients. The fact that an investigation finds the report of suspected abuse to be without merit does not affect the importance of the content to the public.
>
> The record shows that White and Blanchard did not get along and that White criticized Blanchard on a number of occasions. . . . The fact that White may have had a personal interest in reporting the incident does not diminish the concern the public would have in this matter.

*Id.* at 11-13 (citations omitted).

In *Alpine Industries Computers, Inc. v. Cowles Publishing Co.*, 114 Wn. App. 371, 57 P.3d 1178 (2002), this court held that the challenged speech was a matter of public concern. There, a reporter for the *Spokesman-Review* wrote a story about a recent federal court decision favoring Microsoft over a local company, Alpine Industries Computers, Inc. The facts from the story came from the federal court file and primarily was based upon the judge's memorandum opinion. *Id.* at 376. The gist of the story was that

15

Microsoft obtained a large judgment against Alpine for selling pirated software and that

Alpine's owner had acknowledged that he had wrongfully sold counterfeit software. *Id.*

at 374-75. The company brought suit against the newspaper's owner for defamation. In

determining whether the story was of "public concern," we wrote:

> Whether an allegedly defamatory statement pertains to a matter of
> public concern depends on the content, form, and context of the statement
> as shown by the entire record. *Dun & Bradstreet*, 472 U.S. at 761. Here,
> the challenged story relates to a court decision resolving an intellectual
> property dispute between a major software manufacturer and a local retailer.
> Viewed narrowly, the story pertains to a private dispute between two
> business entities. In a broader context, however, the dispute touches on a
> matter of public importance, software piracy. The public concern is
> heightened by the fact that Alpine apparently sold counterfeit software to
> the general consumer. In an age where the use of personal computers is
> widespread, the retail distribution of pirated software is a matter of acute
> importance to general consumers. This is a matter where the First
> Amendment plays a role in ensuring the free flow of information to the
> public. Accordingly, the *Dun & Bradstreet* factors indicate the Alpine case
> was a matter of public concern deserving of heightened protection.

*Id.* at 393-94 (citation omitted). Other cases where we held that the challenged speech

involved a matter of public concern include *Davis*, 180 Wn. App. at 530 (Because

nonviolent boycotts are protected by the First Amendment, because the boycott was a

form of protest of America's role in resolving the Middle East conflict, and because the

plaintiff sought the remedy of injunctive relief, the speech was protected under

RCW 4.24.525); and *Spratt v. Toft*, 180 Wn. App. 620, 632, 324 P.3d 707 (2014) (Former

16

supervisor's alleged defamatory statements against coworker were public concern because the statements, made in connection with his political campaign, could fairly be considered as relating to a matter of political, social, or other concern to the community.).

In contrast, in *Tyner v. Department of Social and Health Services* (DSHS), 137 Wn. App. 545, 154 P.3d 920 (2007), we held that the challenged speech did not involve a matter of public concern. There, Paula Tyner was an administrator for a DSHS facility that cared for adults with developmental disabilities. *Id.* at 552. In the course of her employment, Tyner investigated an employee's sexual harassment complaint. *Id.* at 552-53. Later, human resources directed that the complaint be investigated further by a person a step above Tyner's rank. *Id.* at 553. Tyner commented that the complaint should not be forwarded to her supervisor, Jody Pilarski, because Tyner believed Pilarski would not do a thorough job. *Id.* Human resources disagreed and assigned the investigation to Pilarski. *Id.* During the course of this investigation, Pilarski received numerous complaints that Tyner had created a hostile work environment. *Id.* at 553-54. As a result of these complaints, Tyner was reassigned to region 5 headquarters in Tacoma. *Id.* at 554. Due to budget cuts, Tyner's position was eliminated and she was given different job duties at a different facility. Tyner sued. In her suit, Tyner claimed that she was retaliated against for exercising free speech; specifically, her comment that

17

her supervisor should not be allowed to investigate the employee complaint. *Id.* at 555.

She asserted that her comment addressed a matter of public concern because it involved a

sexual harassment issue. *Id.* at 557. In rejecting her argument, we stated:

> In determining whether an employee['s speech is of public concern],
> we examine several factors, including the content, form, and context of the
> speech in light of the entire record. *Connick*[, 461 U.S. at 147-48]. *The
> speaker's intent is also a factor*—"[w]as the employee acting as an
> aggrieved employee, attempting to rectify problems in the employee's
> working environment, or was he or she acting as a concerned citizen
> bringing a wrong to light?" *Edwards* [*v. Dep't of Transp.*, 66 Wn. App.
> 552, 560, 832 P.2d 1332 (1992)].
>
> . . . .
> . . . Tyner's request that Pilarski not investigate [the sexual
> harassment] allegations . . . based on Tyner's opinion that Pilarski did not
> do a thorough job . . . expressed only her personal dissatisfaction.
> If Tyner's comment were construed as a matter of public concern,
> any speech even tangentially related to a public issue could satisfy the
> public concern requirement for First Amendment protection. This would
> allow even routine criticism of supervisors, internal office decisions, and
> policies to be categorized as matters of public interest, a scenario we
> cautioned against in *Wilson* [*v. State*, 84 Wn. App. 332, 342, 929 P.2d 448
> (1996)].

*Id.* at 557-59 (emphasis added) (some alterations in original).

In *Dillon*, we find further support for the proposition that speech that only

tangentially implicates a public issue is not a matter of public concern:

18

> [W]hen the allegations referring to arguably protected activity are
> only incidental to a cause of action based essentially on nonprotected
> activity, collateral allusions to protected activity should not subject
> the cause of action to the anti-SLAPP statute.

*Dillon*, 179 Wn. App. at 72 (quoting *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188, 6 Cal. Rptr. 3d 494 (2003)).

In this case, we must construe all evidence and inferences in the light most favorable to Johnson, the party resisting the summary dismissal of her defamation claim. In doing so, we must determine whether the content, form, and context of the speech are primarily of a private or primarily of a public concern. As noted in *Tyner*, we may also examine the speaker's intent or motive. By examining the *primary* content, form, and context, we better achieve the legislative purpose of balancing the rights of both litigants so that the expedited summary process weeds out only those defamation claims brought for the abusive primary purpose of chilling valid free public speech. Conversely, were we to align ourselves with the dissent's California approach and examine whether the speech had merely a "connection" to a matter of public concern, we would be ignoring this stated legislative purpose.

Here, the primary content of Ryan's speech is a lengthy and tedious chronology of a private dispute between himself and Johnson, his former boss. The primary intent of the speech is not some lofty public good, but merely establishing that his employer was

19

wrong in firing him. The form of the speech is a blog, useful for conveying either private or public concerns. The context of the speech arises out of a private employment dispute. Ryan primarily complains about how *he* was wrongfully terminated, what *he* has endured through various agency and court actions, and *his* desire for "serious money." The mere fact that these dominant themes are occasionally interspersed with collateral issues of protected public speech—e.g., the executive director of a theatre that depends on public participation and donations has a tyrannical management style—is not enough to transform a private dispute into a matter of public concern. In short, the content and context of Ryan's speech is primarily a matter of his own private concern and, therefore, is not protected public speech under RCW 4.24.525.

## ATTORNEY FEES AND COSTS

Johnson seeks an award of reasonable attorney fees, litigation costs, and special damages of $10,000 under RCW 4.24.525(6)(a). RCW 4.24.525(6)(b) permits such an award if the court finds that a special motion to strike is frivolous or brought solely to cause unnecessary delay. Although we disagree with Ryan's claim of public concern, we do not find that his motion was frivolous nor do we find it was brought to cause unnecessary delay. We therefore reject Johnson's request.

No. 31837-1-III
*Johnson v. Ryan*

In conclusion, we reverse the trial court's order striking Ms. Johnson's claims. We reinstate her claims and remand this case for further proceedings consistent with this opinion.

_____
Lawrence-Berrey, J.

I CONCUR:

_____
Siddoway, C.J.

21

No. 31837-1-III

SIDDOWAY, C.J. (concurring) — "[T]he individual's right to the protection of his good name 'reflects no more than our basic concept of the essential dignity and worth of every human being—a concept at the root of any decent system of ordered liberty.'" *Gertz v. Robert Welch, Inc.*, 418 U.S. 323, 341, 94 S. Ct. 2997, 41 L. Ed. 2d 789 (1974) (quoting *Rosenblatt v. Baer*, 383 U.S. 75, 92, 86 S. Ct. 669, 15 L. Ed. 2d 597 (1966) (Stewart, J., concurring)).

Had James Ryan responded to Yvonne Johnson's perceived wrongs against him by throwing a rock through her window or breaking her nose, she would have had a right to complete redress. Instead—if the allegations of her complaint are proved—he found a more brutally effective form of retribution: destroying her professional reputation.

Every defamation case presents an opportunity for us to reaffirm the importance of free speech to a democratic society. Here, a plaintiff claiming actual harm caused by culpable falsehood has had her complaint dismissed at the inception of her case. It is incumbent on us to consider the important interests she has at stake as well.

I agree with most of the majority opinion. I write separately to emphasize two matters that are important in construing the 2010 amendments to the anti-SLAPP statute.[1]

The first is that there is nothing in the statute or the legislature's findings that evinces a legislative intent to make substantive changes to the law of defamation. When it comes to defamation claims, the legislature's preamble to the 2010 legislation tells us that its intent was to enable defendants to extricate themselves at the earliest possible stage from a claim that is doomed from its inception, not to alter a plaintiff's right to redress for defamatory falsehoods—a right that arguably enjoys protection under article I, section 5 of the Washington Constitution.

Second, and more particularly, construing "public concern" as broadly as California's "public interest" standard will change our defamation law in a way that is inconsistent with the legislature's intent to "[s]trike a balance between the rights of persons to file lawsuits and to trial by jury and the right of persons to participate in matters of public concern." LAWS OF 2010, ch. 118, § 1(2)(a). It is critical, as the majority opinion holds, that we construe "public concern" as an intentional adoption of the longstanding standard for identifying speech entitled to heightened First Amendment protection. We should not look to cases construing California's far broader "public interest" standard, which is untethered to any value of the speech that it protects.

---

[1] Strategic Lawsuit Against Public Participation. RCW 4.24.510.

*The constitutionalization of defamation law*
*under the First Amendment already provides*
*significant protections for speech*

Over the last 50 years, protections for speech recognized under the First Amendment have restricted the states' freedom to define and impose damages on defamatory speech, transforming defamation law in ways that have consistently favored defendants. Before *New York Times Co. v. Sullivan*, 376 U.S. 254, 267, 84 S. Ct. 710, 11 L. Ed. 2d 686 (1964), once a plaintiff alleged statements constituting "libel per se" that were of and concerning her, a defendant's only defense was to prove that his statements were true. General damages would be presumed. In *New York Times*, the United States Supreme Court concluded that applying the common law in favor of a public official suing for defamation was akin to punishing seditious libel, in violation of the speaker's First Amendment rights. It held that a public official could not recover damages for a defamatory falsehood relating to his official conduct "unless he proves that the statement was made with 'actual malice'—that is, with knowledge that it was false or with reckless disregard of whether it was false or not." 376 U.S. at 279-80. It also required that actual malice be demonstrated with convincing clarity. *Id.* at 285-86.

In *Garrison v. Louisiana*, 379 U.S. 64, 74, 85 S. Ct. 209, 13 L. Ed. 2d 125 (1964), which the Supreme Court decided later in 1964, the Court held that even though truth was not a defense to criminal libel at common law (since a purpose of criminal libel was to avert the possibility that even a truthfully maligned victim would breach the peace), true

3

statements could not constitutionally be the subject of either civil or criminal sanctions where "discussion of public affairs" was concerned.

In *Curtis Publishing Company v. Butts*, 388 U.S. 130, 155, 87 S. Ct. 1975, 18 L. Ed. 2d 1094 (1967), the Supreme Court extended the actual malice standard to plaintiffs who were "public figures" under ordinary tort rules. It characterized public figures as "command[ing] sufficient continuing public interest and . . . sufficient access to the means of counterargument to be able 'to expose through discussion the falsehood and fallacies' of defamatory statements," either based on the public figure's "position alone" or by "purposeful activity amounting to a thrusting of [one's] personality into the 'vortex' of an important public controversy." *Id.* at 155 (quoting *Whitney v. Cal.*, 274 U.S. 357, 377, 47 S. Ct. 641, 71 L. Ed. 1095 (1927) (Brandeis, J., dissenting)).

In *Gertz*, the Court retooled an earlier approach[2] and held that the proper accommodation between the law of defamation and the freedoms protected by the First Amendment required differentiating between public officials and public figures, on the one hand, and private individuals, on the other. It held that the *New York Times* standard "defines the level of constitutional protection appropriate to the context of defamation of

---

[2] *Gertz* abrogated *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44-45, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), in which a plurality had concluded that "the time has come forthrightly to announce that the determinant whether the First Amendment applies to state libel actions is whether the utterance involved concerns an issue of *public or general concern*, albeit leaving the delineation of the reach of that term to future cases." (Emphasis added).

4

a public person." *Gertz*, 418 U.S. at 342. But speaking of a private individual, the Court

said:

> He has relinquished no part of his interest in the protection of his own good
> name, and consequently he has a more compelling call on the courts for
> redress of injury inflicted by defamatory falsehood. Thus, private
> individuals are not only more vulnerable to injury than public officials and
> public figures; they are also more deserving of recovery.

*Id.* at 345. *Gertz* held that "so long as they do not impose liability without fault, the

States may define for themselves the appropriate standard of liability for a publisher or

broadcaster of defamatory falsehood injurious to a private individual." *Id.* at 347. It also

held that the plaintiff in *Gertz*—a public figure—could not recover presumed damages

nor recover punitive damages unless the publication was made with actual malice. *Id.* at

349-50.

In *Cox Broadcasting Corp. v. Cohn*, 420 U.S. 469, 491, 95 S. Ct. 1029, 43 L. Ed.

2d 328 (1975), the Supreme Court held that a state could not impose sanctions for the

accurate publication of the name of a rape victim obtained from judicial records

maintained in connection with a public prosecution and which themselves were open to

public inspection.

In 1981, our own Supreme Court went beyond the United States Supreme Court,

holding that for "policy reasons, rooted in the First Amendment," an "early testing of

plaintiff's evidence by a convincing clarity burden" was appropriate in all defamation

cases, as to all elements—even in cases involving private plaintiffs, if the offending

5

publication addressed a matter of public concern. *Mark v. Seattle Times*, 96 Wn.2d 473, 487, 635 P.2d 1081 (1981). The viability of that holding is questionable in light of later cases. *See Herron v. Tribune Publ'g Co.*, 108 Wn.2d 162, 170-71, 736 P.2d 249 (1987) (appearing to tie summary judgment standard to the standard of proof at trial); *Haueter v. Cowles Publ'g Co.*, 61 Wn. App. 572, 582, 811 P.2d 231 (1991) (concluding that "[n]either the common law nor the First Amendment . . . requires proof of any element of a defamation action, other than actual malice, by evidence of convincing clarity"); *Richmond v. Thompson*, 130 Wn.2d 368, 385-86, 922 P.2d 1343 (1996) (rejecting the position that the First Amendment demands the application of a higher evidentiary standard at the summary judgment stage); *Mohr v. Grant*, 153 Wn.2d 812, 822 & nn. 7-8, 108 P.3d 768 (2005) (stating that "[c]ase law is unclear as to whether a private plaintiff facing a defense motion for summary judgment must make a prima facie showing of all of the elements of defamation with convincing clarity or by a preponderance of the evidence," and deferring clarification "for another day"); *Mohr*, 153 Wn.2d at 833 (Chambers, J., dissenting) (citing *Mark*'s conclusion that a private plaintiff resisting a defense motion for summary judgment must establish a prima facie case by convincing clarity as "the concession defamation law makes to the First Amendment").

Returning to United States Supreme Court precedent, in a 1984 defamation action brought by the Bose Corporation, the Court recognized a heightened standard for appellate review in favor of defamation defendants, holding that "in cases raising First

Amendment issues . . . an appellate court has an obligation to 'make an independent examination of the whole record' in order to make sure that 'the judgment does not constitute a forbidden intrusion on the field of free expression.'" *Bose Corp. v. Consumers Union of United States, Inc.*, 466 U.S. 485, 499, 104 S. Ct. 1949, 80 L. Ed. 2d 502 (1984) (quoting *New York Times*, 376 U.S. at 284-86).

In *Dun & Bradstreet, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 751, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985), a majority of justices reasoned that the plaintiff in *Gertz* had been limited in the damages he could recover because the speech at issue had involved a matter of public concern. It held that where a defendant's speech concerned a private individual and a matter of private concern, states could allow plaintiffs to recover presumed and punitive damages even absent a showing of actual malice. *Id.* at 761.

In *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 254, 106 S. Ct. 2505, 91 L. Ed. 2d 202 (1986), the Supreme Court held that when ruling on a summary judgment in any civil case in which the "clear and convincing" standard applies, the trial court must bear in mind "the actual quantum and quality of proof necessary to support liability." Because *Liberty Lobby* was an action for defamation by a public figure, the actual malice standard applied. Accordingly, the Court held that to survive summary judgment, the evidence presented by the plaintiff must be "of []sufficient caliber or quantity to allow a rational finder of fact to find actual malice by clear and convincing evidence." *Id. Liberty*

*Lobby*'s construction of Federal Rules of Civil Procedure 56 was applied to CR 56 by our state Supreme Court in *Herron*, 108 Wn.2d at 170.

In *Philadelphia Newspapers, Inc. v. Hepps*, 475 U.S. 767, 777, 106 S. Ct. 1558, 89 L. Ed. 2d 783 (1986), the Court held that the common law presumption that defamatory speech is false "cannot stand" even for a private party plaintiff, if he or she "seeks damages against a media defendant for speech of public concern." "In other words, the Court fashioned 'a constitutional requirement that the plaintiff bear the burden of showing falsity, as well as fault, before recovering damages.'" *Milkovich v. Lorain Journal Co.*, 497 U.S. 1, 16, 110 S. Ct. 2695, 111 L. Ed. 2d 1 (1990) (quoting *Hepps*, 475 U.S. at 776).

In *Milkovich,* the Court held that a statement on matters of public concern "must be provable as false before there can be any liability under state defamation law," meaning that "a statement of *opinion* relating to matters of public concern which does not contain a provably false factual connotation will receive full constitutional protection." 497 U.S. at 19-20 (emphasis added).

All of these important limitations on defamation claims flow from our "profound national commitment," reflected in the First Amendment, "to the principle that *debate on public issues* should be uninhibited, robust, and wide-open." *New York Times*, 376 U.S. at 270 (emphasis added). But in construing RCW 4.24.525 to carry out the legislature's stated objective of striking a balance that recognizes "the rights of persons to file lawsuits

8

and to trial by jury,"[3] we must remember that the constitutionalization of defamation law under the First Amendment has already altered the common law balance, making it more difficult for defamed plaintiffs to obtain redress: it has in many cases shifted the burden of proving falsity to the plaintiff; it has eliminated liability for a defendant's statements that do not have a provably false connotation; it has eliminated liability for true reports of matters reflected in judicial records of public prosecutions; it has required public officials and public figures to prove actual malice by clear and convincing evidence;[4] for private figure plaintiffs, it has imposed the same burden of proof if they seek to recover presumed or punitive damages flowing from speech on a matter of public concern; and it has imposed heightened appellate review that focuses on the rights of defamation defendants.

*The legislature's statement of purpose evinces the intent to accelerate the dismissal of doomed claims, not to impose additional burdens on a plaintiff's right to sue for defamation*

The legislature's 2010 amendment to the anti-SLAPP statute cannot reasonably be read as intended to create an additional substantive hurdle for defamation plaintiffs. No concern is expressed in the preamble about existing elements or standards of proof. The

---

[3] LAWS OF 2010, ch. 118, § 1(2)(a).

[4] The Supreme Court observed in *Gertz* that "[p]lainly many deserving plaintiffs, including some intentionally subjected to injury, will be unable to surmount the barrier of the *New York Times* test." 418 U.S. at 342.

purpose for the motion to strike procedure is explained as accelerating the dismissal of claims that are preordained to fail and sanctioning the plaintiffs who bring them.

The act's preamble contains multiple textual indications that the legislature was not concerned about plaintiffs who had viable defamation claims under existing law. Its findings state that its concern is with lawsuits that are "brought *primarily to chill the valid exercise of . . . constitutional rights.*" LAWS OF 2010, ch. 118, § 1(1)(a) (emphasis added). They state that problematic lawsuits "are typically dismissed as groundless or unconstitutional"—the problem being that such cases are not dismissed early enough. *Id.* at § 1(1)(b). The findings state that the citizens about whom the legislature is concerned are those who would "fear . . . reprisal through *abuse* of the judicial process." *Id.* at § 1(1)(d) (emphasis added). They state that the act's purpose is to "[s]trike a balance" that recognizes "the rights of persons to file lawsuits and to trial by jury." *Id.* at § 1(2)(a).

The only intended change to defamation law expressed by the 2010 legislation is to spare defendants from pointless expense and inconvenience by allowing stays of discovery, expedited dismissal, and expedited appeal. The legislature's findings express concern that while groundless and unconstitutional claims are typically dismissed, it is "often not before the defendants are put to great expense, harassment, and interruption of their productive activities." *Id.* at § 1(1)(b). The findings state that a purpose of the act was to "[e]stablish an efficient, uniform, and comprehensive method for speedy

adjudication of strategic lawsuits against public participation" and "[p]rovide for attorneys' fees, costs, and additional relief where appropriate." *Id.* at § 1(2)(b), (c).

It may be that for a defamation plaintiff (depending on our Supreme Court's ultimate clarification of *Mark*) the clear and convincing evidence standard by which she must establish a probability of prevailing to survive a motion to strike will prove to be a new substantive standard. But nothing about the 2010 legislation suggests that this was intentional on the part of the legislators. It appears to have been the view of at least some who participated in drafting the law and urging its enactment that Washington defamation plaintiffs already face this burden at the summary judgment stage under *Mark*; in their view, the only change wrought by the 2010 legislation was to accelerate the burden to the outset of litigation. *See* Bruce E.H. Johnson & Sarah K. Duran, *A View from the First Amendment Trenches: Washington State's New Protections for Public Discourse and Democracy*, 87 WASH. L. REV. 495, 497, 524 (2012) (recounting the authors' involvement with the legislation and observing that the requirement of clear and convincing proof of all elements of a plaintiff's case "merely codifie[s] the common law of defamation from *Mark v. Seattle Times*.").

If our Supreme Court hereafter decides that the burden imposed on defamation plaintiffs at the summary judgment stage by *Mark* has no basis in the First Amendment and is contrary to summary judgment practice in other cases, then RCW 4.24.525 does

11

impose a substantive standard for purposes of surviving the motion to strike that is higher

as to some elements, and as to some plaintiffs, than is the standard of proof at trial.[5]

Overall, the 2010 changes do not reflect a legislative intent to alter Washington's

law of defamation. Most importantly, they do not reflect a legislative intent to adopt a

meaning for "public concern" that is different from that term's longstanding use to

identify speech that is entitled to heightened protection under the First Amendment.

> *"Public concern" is a longstanding term identifying speech*
> *entitled to heightened protection under the First*
> *Amendment—and a strikingly different concept than "public*
> *interest" under California's anti-SLAPP statute*

The United States Supreme Court has "long recognized that not all speech is of

equal First Amendment importance. It is speech on 'matters of public concern' that is 'at

the heart of the First Amendment's protection." *Dun & Bradstreet*, 472 U.S. at 758-59

(footnote omitted) (internal citation marks omitted) (quoting *First Nat'l Bank of Boston v.*

*Bellotti*, 435 U.S. 765, 776, 98 S. Ct. 1407, 55 L. Ed. 2d 707 (1978)).

The concept that some speech is entitled to heightened First Amendment

protection has been recognized for at least 75 years. It was discussed in *Thornhill v.*

---

[5] Constitutional challenges to the discrepancy between the standard on which the trial court is required to strike a claim and the standard that would apply at trial were raised and rejected in a decision by Division One of our court, and are presently before our Supreme Court for review. *Davis v. Cox*, 180 Wn. App. 514, 546-48, 325 P.3d 255 (2014), *review granted*, No. 902330 (Wash. Oct. 9, 2014). Constitutional challenges were not raised in this appeal.

*Alabama*, 310 U.S. 88, 60 S. Ct. 736, 84 L. Ed. 1093 (1940), in which the Court reviewed the conviction of a striking union member arrested while picketing a mill, pursuant to an Alabama statute that outlawed loitering or picketing a business.  In reversing the union member's conviction, the Court said,

> The freedom of speech and of the press guaranteed by the Constitution embraces at the least the liberty to discuss publicly and truthfully *all matters of public concern* without previous restraint or fear of subsequent  punishment.  The exigencies of the colonial period and the efforts to secure freedom from oppressive administration developed a broadened conception of these liberties as *adequate to supply the public need for information and education with respect to the significant issues of the times. . . .  Freedom of discussion, if it would fulfill its historic function in this nation, must embrace all issues about which information is needed or appropriate to enable the members of society to cope with the exigencies of their period.*

*Id.* at 101-02 (footnotes omitted) (emphasis added).

Matters of public interest, public concern, and public affairs continued to be recognized as worthy of special protection in the United States Supreme Court's First Amendment jurisprudence in the 1960s, even if the basis for imposing the actual malice standard in a defamation case was a plaintiff's status as a public official or a public figure. *E.g., Garrison*, 379 U.S. at 74 (providing heightened protection for "discussion of public affairs"); *Pickering v. Bd. of Educ. of Twp. High Sch. Dist. 205*, 391 U.S. 563, 573, 88 S. Ct. 1731, 20 L. Ed. 2d 811 (1968) (discussing the great "public interest in having free and unhindered debate on matters of public importance—the core value of the Free Speech Clause of the First Amendment").

For several years in the early 1970s, a plurality of the United States Supreme Court even held that the fact that a publication dealt with an issue of "public concern" should be *the* basis for applying the First Amendment's actual malice standard and the requirement of proof by convincing clarity. *Rosenbloom v. Metromedia, Inc.*, 403 U.S. 29, 44-45, 91 S. Ct. 1811, 29 L. Ed. 2d 296 (1971), *abrogated by Gertz*, 418 U.S. at 343-44. While the Court's 1974 decision in *Gertz* returned the defamation plaintiff's status as a public official, public figure, or private figure to primary importance, the fact that a publication did or did not deal with an issue of public concern continued to be relevant in many cases to its protected status, including public employment cases that have further developed factors to be considered in determining whether a communication "fall[s] under the rubric of matters of 'public concern.'" *Connick v. Myers*, 461 U.S. 138, 148, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983);[6] *accord Dun & Bradstreet*, 472 U.S. at 756 (distinguishing *Gertz* as involving expression on a matter of "undoubted public concern").

In explaining why "speech on 'matters of public concern' . . . is 'at the heart of the First Amendment's protection,'" the Supreme Court in *Dun & Bradstreet* shed light on what it meant by speech on matters of public concern. 472 U.S. at 758-59 (internal

---

[6] The content of the speech is generally the most important. *Karl v. City of Mountlake Terrace*, 678 F.3d 1062, 1069 (9th Cir. 2012). The relevance of motive is in understanding the context of a remark and is considered in relation to the content of the speech itself. *Kokkinis v. Ivkovich*, 185 F.3d 840, 848 (7th Cir. 1999).

14

quotation marks omitted) (quoting *Bellotti*, 435 U.S. at 776. It spoke of the First

Amendment having been "'fashioned to assure unfettered interchange of ideas for the

bringing about of political and social changes desired by the people.'" *Dun &*

*Bradstreet*, 472 U.S. at 759 (internal quotation marks omitted) (quoting *Roth v. United*

*States*, 354 U.S. 476, 484, 77 S. Ct. 1304, 1 L. Ed. 2d 1498) (1957)). It characterized

such speech as "'[s]peech concerning public affairs'" that is "'more than self-

expression; it is the essence of self-government.'" *Id.* (quoting *Garrison*, 379 U.S. at 74-

75). In deciding whether the speech at issue involved a matter of public concern, the

factors that it chose to apply were those identified in its 1983 decision in *Connick*, which

it described as arising "[i]n a related context." *Dun & Bradstreet*, 472 U.S. at 761.

In *Connick*, the Court observed that the Constitution's "special concern with

threats to the right of citizens to participate in political affairs is no mystery." 461 U.S. at

145. In addition to quoting *Garrison*'s characterization of speech concerning public

affairs as "'more that self-expression'" and "'the essence of self-government,'" *id.*

(quoting Garrison, 379 U.S. at 74-75) and *Roth*'s observation that the First Amendment

"'was fashioned to assure unfettered interchange of ideas for the bringing about of

political and social changes,'" *id.* (quoting *Roth*, 354 U.S. at 484), it stated that the Court

had "frequently reaffirmed that speech on public issues occupies the 'highest rung of the

hierarchy of First Amendment values,' and is entitled to special protection." *Id.* (quoting

*Nat'l Ass'n for Advancement of Colored People v. Claiborne Hardware Co.*, 458 U.S.

15

886, 913, 102 S. Ct. 3409, 73 L. Ed. 2d 1215 (1982); *Carey v. Brown*, 447 U.S. 455, 467, 100 S. Ct. 2286, 65 L. Ed. 2d 263 (1980)).

To be sure, neither the United States Supreme Court nor our own Supreme Court has slavishly used the term "public concern" in discussing speech entitled to heightened protection. Both have spoken of "public interest" and "public affairs" somewhat interchangeably. But the clearly predominant label that federal courts and our own have applied in identifying that speech whose character warrants special protection under the First Amendment is speech on issues or matters of "public concern."

As the majority explains, our legislature's notable substitution of the "public concern" for the California statute's reference to "public interest" reflects an implicit rejection of the California term and the case law construing it. Majority at 12-13. Moreover, "'if the legislature uses a term well known to the common law, it is presumed that the legislature intended to mean what it was understood to mean at common law.'" *Ralph v. Dep't of Natural Res.*, No. 88115-4, 2014 WL 7445555 at *2 (Wash. Dec. 31, 2014) (quoting *N.Y. Life Ins. Co. v. Jones*, 86 Wn.2d 44, 47, 541 P.2d 989 (1975)). The legislature's rejection of "public interest" in favor of "public concern" is a clear indication that the well-known First Amendment concept was intended. There is no need to resort to dictionary definitions.

The rubric "public concern" imparts a meaning very different from the meaning that California courts have ascribed to "public interest" as used in that state's anti-SLAPP

16

statute.[7] "Public interest" has been construed as untethered to any value of speech under the First Amendment. California courts have construed it to mean "any issue in which the public is interested." *Nygard, Inc. v. Uusi-Kerttula*, 159 Cal. App. 4th 1027, 1042, 72 Cal. Rptr. 3d 210 (2008). In describing the exceptionally broad construction of "public interest" by California courts, the Ninth Circuit Court of Appeals has observed that the California Supreme Court

> has "explicitly rejected the assertion that the only activities qualifying for statutory protection are those which meet the lofty standard of pertaining to the heart of self-government." *Navellier* [*v. Sletten*, 29 Cal. App. 4th 82, 52 P.3d 703, 710, 124 Cal. Rptr. 2d 530 (2002)] (internal quotation marks omitted). Thus, the activity of the defendant need not involve questions of civic concern; social or even low-brow topics may suffice.

*Hilton v. Hallmark Cards*, 599 F.3d 894, 905 (9th Cir. 2010). Washington commentators have agreed that California's is "one of the broadest anti-SLAPP statutes in the United States." Johnson & Duran, *supra*, at 523.

The decision in *Tamkin v. CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 122 Cal. Rptr. 3d 264 (2011) illustrates just how far removed from a First Amendment value-driven concept of "public concern" California's *non*-First Amendment value-driven concept of "public interest" can be. In that case, a casting synopsis was prepared for two

---

[7] On this score, I disagree not only with the dissent but also with the view expressed in *Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. 591, 599, 323 P.3d 1082 (2014) that there was "no discernible difference" in the terms "public interest" and "public concern."

17

characters, "Scott Tamkin" and "Melinda Tamkin" who would play parts in an upcoming episode of the television program *CSI: Crime Scene Investigation.* Scott and Melinda Tamkin were the names of a real-life married couple, both real estate agents. A writer for the *CSI* series met the Tamkins when she made an offer on a home that she later exercised her right to cancel.

The writer used the Tamkins' names as placeholders in drafting a script for an episode of *CSI* about a troubled fictional married couple who were both real estate professionals. The writer intended to substitute other names in the final script. The casting synopses were inadvertently released using the names "Scott Tamkin" and "Melinda Tamkin" and described the characters in defamatory ways bearing no relation to the real Mr. and Mrs. Tamkin. When Mr. Tamkin discovered the synopses on the Internet, he and his wife brought suit.

An anti-SLAPP motion to strike the Tamkins' complaint was granted and affirmed on appeal. The facts that the Tamkins were private figures, that they did nothing to cause their names to be included in a *CSI* script, and *even that the script and casting synopses were admitted fiction,* proved irrelevant to the appellate court's "public interest" analysis. Instead, it was enough that there was public interest "in the creative process underlying the production of the film" and that the defendants "showed that there was a public interest in the writing, casting, and broadcasting of *CSI* episode 913." *Id.* at 144. The public interest in *CSI* episode 913 was shown "by the posting of the casting synopses on

18

various Web sites and the ratings for the episode." *Id.* at 143. In California, then, not only debatable fantasy but admitted fantasy (and about private plaintiffs) is a matter of "public interest," as long as it is interesting.

Such a broad meaning of "public concern" would introduce dissonance into RCW 4.24.525(2). Under the principle of noscitur a soccis, "'the meaning of words may be indicated or controlled by those with which they are associated.'" *State v. Jackson*, 137 Wn.2d 712, 729, 976 P.2d 1229 (1999) (quoting *Ball v. Stokely Foods, Inc.*, 37 Wn.2d 79, 87–88, 221 P.2d 832 (1950); *accord State v. Budik*, 173 Wn.2d 727, 735, 272 P.3d 816 (2012) (construing six criminal means delineated by statute as having common qualities, rather than as including an outlier). RCW 4.24.525(2)'s first three examples of actions "involving public participation and petition" are all statements in, in connection with, or encouraging or enlisting participation in a governmental proceeding. RCW 4.24.525(2)(a)-(c). Its fourth and fifth examples are statements made in a public forum or otherwise in connection with an issue of public concern. RCW 4.24.525(2)(d)-(e). If "public concern" is understood to mean the type of speech given heightened protection in First Amendment jurisprudence, then all five examples of actions "involving public participation and petition" are communications relevant to self-government or political and social change. On the other hand, if "public concern" is construed as having the same meaning given "public interest" by California courts, then RCW 4.24.525 identifies three related examples of political participation and two

unrelated examples ("anything interesting") that would hardly be known by their associates.

Finally, the broad California construction would burden many plaintiffs' ability to hold a defendant responsible for an abuse of the defendant's right to speak freely, with no First Amendment justification for imposing that burden. This raises potential issues under article I, section 5 of the Washington Constitution.

*The Washington Constitution provides that every speaker is responsible for an abuse of his right to freely speak, write and publish*

The Washington Constitution provides at article I, section 5, that "[e]very person may freely speak, write and publish on all subjects, *being responsible for the abuse of that right.*" (Emphasis added). In a dissenting opinion in *Beauharnais v. Ill.*, 343 U.S. 250, 292 & n.6, 72 S. Ct. 725, 96 L. Ed. 919 (1952), Justice Jackson, having surveyed state constitutions, identified more than 40 (including Washington's) that, "while extending broad protections to speech and press, reserve a responsibility for their abuse and implicitly or explicitly recognize validity of criminal libel laws." Constitutional protections of speech of this sort have been referred to as "liberty and responsibility" clauses. *Ex Parte Tucci*, 859 S.W.2d 1, 22-23 (Tex. 1993) (Phillips, J., concurring); *Am. Bush v. City of South Salt Lake*, 2006 UT 40, 140 P.3d 1235, 1241. "Historical evidence indicates that the phrase imposing responsibility for the 'abuse' of the right was inserted to preserve civil liability for defamation." 1 Jennifer Friesen, STATE CONSTITUTIONAL

20

LAW: LITIGATING INDIVIDUAL RIGHTS, CLAIMS, AND DEFENSES § 5.02[3][e] at 5-10 (4th ed. 2006); *accord Wheeler v. Green*, 286 Or. 99, 118, 593 P.2d 777 (1979) (holding that defamatory statements are recognized as an abuse of the right of free expression for which a person is to be held responsible under article I, section 8 of the Oregon Constitution); *Turner v. KTRK Television, Inc.*, 38 S.W.3d 103, 117 (Tex. 2000) (holding that "the Texas Constitution expressly guarantees the right to bring reputational torts"); *Telnikoff v. Matusevitch*, 347 Md. 561, 614, 702 A.2d 230 (1997) (Chasanow, J., dissenting) (characterizing article 40 of the Maryland Declaration of Rights as containing "a safeguard against defamation" not found in the United States Constitution); *Am. Bush*, 140 P.3d at 1244 (characterizing it as "undoubtedly true" that the phrase "responsible for the abuse" in Utah's liberty and responsibility clause was intended to preserve liability for defamation). *But cf. Werner v. S. Cal. Associated Newspapers*, 35 Cal. 2d 121, 124-25, 216 P.2d 825 (1950) (construing the abuse language as merely making clear that the right of free speech does not guarantee immunity from liability).

Of course, we avoid deciding constitutional questions where a case may be fairly resolved on other grounds. *Cmty. Telecable of Seattle, Inc. v. City of Seattle, Dep't of Exec. Admin.*, 164 Wn.2d 35, 41, 186 P.3d 1032 (2008). A narrow, First Amendment-based meaning of "public concern" is most likely to avoid a constitutional challenge under article I, section 5 of the Washington Constitution. Nevertheless, because I agree with the majority that there are ample nonconstitutional reasons why "public concern"

21

No. 31837-1-III – concurring
*Johnson v. Ryan*

should be understood to have its well-settled meaning, it is premature to analyze the

meaning of the "responsible for the abuse" language in that section of our constitution.

Siddoway, C.J.

No. 31837-1-III

FEARING, J. (dissenting) —

INTRODUCTION

This appeal asks this court to interpret the expression "public concern" found in the 2010 Washington anti-SLAPP (Strategic Lawsuit Against Public Participation) statute, RCW 4.24.525. We need not announce a comprehensive definition for the statutory phrase, but only determine whether vitriolic blogging of James Ryan targeting Spokane Civic Theatre Executive Artistic Director Yvonne Johnson fits within the term.

The majority holds that James Ryan's "blogging was primarily for personal concern, not public concern." Majority at 1. I do not know if the majority rules that Ryan's blogging is of no public concern or is of public concern, but motivated more by personal concern. Regardless, I dissent, because the blogging contained elements of public concern. More importantly, the anti-SLAPP statute does not authorize this court or the trial court to weigh the motivation of James Ryan. Personal gain or vengeance is not relevant in determining whether speech is of public concern. Since Ryan's comments about Yvonne Johnson were of public concern and since Johnson fails to present a prima facie case of liability, I dissent.

FACTS

I try not to repeat all facts outlined by the majority, but repeat some for emphasis. The Spokane Civic Theatre is a not-for-profit, performing arts theatre located in Spokane. The Civic Theatre is a private foundation receiving support from private donors and operating with an endowment—the Spokane Civic Theatre Endowment Fund. A

Wikipedia entry described the Civic Theatre as "one of the oldest community theatres in the country . . . [and] a point of pride for the city [of Spokane]." Clerk's Papers (CP) at 55.

The Spokane Civic Theatre's website declares that "the tradition of public education has continued throughout our history." CP at 27. As such, the theatre serves as an educational resource for local high school and college drama departments. At least one thousand volunteers assist the Civic Theatre. The Theatre's website further reads: "In addition to volunteering their time, the Spokane Community has given incredible amounts in the form of donations that support us in our mission to provide and support theatre excellence." CP at 27.

In 2005, the Spokane Civic Theatre hired plaintiff Yvonne Johnson as its executive artistic director. On January 27, 2005, the *Spokesman-Review*, Spokane's major newspaper, published an article introducing Johnson to the community.

On August 29, 2010, the *Spokesman-Review* published an article praising Yvonne Johnson for helping the Spokane Civic Theatre thrive despite the brutal economy. The article quoted one local director and performer: "'I think she's been a gift to the community. She has helped the Spokane Civic Theatre regain its standards as a glorious and reliable theater.'" CP at 51.

Yvonne Johnson maintained her own website, www.yvonneakjohnson.com. The website promoted her career. The website described, in part, her duties as executive artistic director at the Spokane Civic Theatre. The duties included assisting the Theatre's

2

business manager and director of development on obtaining grants, cultivating donor relations, administering personnel policies, ensuring compliance with state and federal regulations, representing the Theatre to the community, and maintaining contact with state and national arts organizations.

As the executive artistic director, Yvonne Johnson supervised and evaluated Civic Theatre employees and administered grievance and termination procedures. On August 19, 2010, Johnson hired defendant James Ryan as music director for the Theatre. Ryan desired employment with a community theatre like the Spokane Civic Theatre, as opposed to a professional theatre where talent moves from place to place to further careers. Ryan believed that working for the Spokane Civic Theatre would allow his family a better connection to its home community.

Two months after the hiring, Yvonne Johnson terminated James Ryan's employment for cause at the direction of the Civic Theatre's board. Yvonne Johnson wrote a termination letter to Ryan. Because Ryan claims the letter confirms the "public" nature of the Civic Theatre, I quote much of the letter here:

> As we discussed Sunday, October 17, 2010, your employment with the Theatre is terminated effective October 17, 2010. . . .
> YOUR PRE-TERMINATION CONDUCT
> The Theatre decided to terminate your employment because you exercised extremely poor judgment by placing into the public domain sexually graphic text and pictures of you and Lynette [Ryan's wife] combined with information that permitted an association to the Theatre. There are three gross offenses here.
> First, there is the *public nature* of your indiscretions due to using www.Craigslist.org to solicit sex. For most people—sexual conduct is a

3

personal matter, not something to be shared with the community at large or imported into the workplace.

Second, you would have been fine had you exercised even a modicum of judgment and maintained professional anonymity. Instead you chose to publicly associate your sexual activities with the Theatre by referencing your workplace in e-mails, sending sexually explicit e-mails from work while backstage, and using your photo that is on the Theatre's website to solicit sexual activity. . . .

. . . .

Third, as the Music Director, you were in a leadership position and miserably failed to uphold yourself to the *high public standards charged to representatives of the Theatre.* (See our handbook). On Friday, October 15, 2010, you first disclosed your personal sexual activities to me. As I told you then and as I believe in my heart now, the Theatre neither judges nor cares about what employees do in their personal lives. . . .

However, the very moment that the Theatre became implicated is the moment that serious business concerns arose. What was once wholly personal quickly transformed into a matter regarding professional judgment and leadership competence.

. . . However, our personal sensitivities are not the proper measure for the appropriate boundaries of *public decorum for representatives of the Theatre.* In gauging our *public actions,* we must think of *the diverse community we serve* and the potential for its offense. We serve mature audiences and youth audiences. We serve audiences both conservative and liberal, both modest and flagrant. *Given the range of diversity, the Theatre must take a high road and hold itself and its representatives to the highest of ethical standards, lest we offend even a fraction of our supporters none of whom we can afford to alienate. The* potential *to offend the local community is the appropriate measure to guide our judgment.* As a director and leader of the Theatre, you, of all people, should have known better, Jim.

*You know how dependent we are upon the good will of the local community in the greater Spokane metropolitan area.* The Theatre exists and thrives only because of local support. Local ticket sales, local donations, and local volunteers are the lifeblood for our not-for-profit and growing civic theatre. Furthermore, we are not the only game in town. The competition for local charity is fierce and dollars and resources are scarcer due to the degraded state of the economy. Before associating the Theatre with your graphically nude pictures and public domain solicitations for sex, did you even once think beyond your personal gratification and consider the potential negative impact on the Theatre's patron, donor and/or

volunteer support? The Theatre could have and still can go down in financial flames because of what you have done. All of our hard work could be lost to *public scandal* and the Theatre could dwindle into obscurity. . . .

POST-TERMINATION CONDUCT

To worsen matters, you horribly mismanaged your response to the Theatre's reaction. On Sunday, October 17, 2010, I contacted you to have an in-person meeting with the Board so that we could professionally discuss options. Instead, you refused, became belligerent, and engaged in a smear campaign to discredit me and the Theatre by falsely spreading rumors that your termination was due to disclosing your status as a "swinger." As you may recall, you disclosed that information to me on Friday, October 15, 2010. It was no big deal then and remains innocuous to this day. The concerns arose later that afternoon while reviewing the photographs and text and realizing the public nature of the association of your sexual solicitations with the Theatre. Even then, the reinstatement of you and Lynette to the Theatre's employ and rehabilitation of the Theatre's image might have been possible. It appears that dissemination of the information may have been limited. Maybe we could have hired a publicist to help us address potential image damage.

. . . .

In light of the above, the Board does not view its termination actions as unfair, unduly harsh or artistically stifling in direct contravention of the Theatre's mission. The decision was made after careful and compassionate deliberation. *Of course, as vanguards of the dramatic arts, the Theatre is cognizant of its role in challenging the community's intellect and in pushing the boundaries of creativity and artistic expression.* However, your public sexual endeavors are exclusively prurient in nature and deserve no safe harbor.

We are truly sorry for the co-victims of your indiscretion and poor judgment, namely Lynette and your son. Because Lynette was an employee and her sexual activities were publicly associated with the Theatre (albeit through your actions), termination was unavoidable. The end result and the potential for the Theatre's financial ruin is just as great. You are fortunate you are on good terms with her for she likely has a legal claim against you if the disclosures were made without her consent.

It is unfortunate we find ourselves in this position. We wish that you would have maintained anonymity and kept your private life out of the workplace. We also wish that you would have responded more amicably and responsibly instead of making matters more public and enlarging the potential harm. Now, in addition to the potentially adverse financial

5

repercussions, the Theatre is losing two contributing and talented employees.

We wish you the best of luck and goodwill in your future endeavors and hope that you now better understand the reasons for our actions. Hopefully, the better human being in you will forego any vengeful and malicious actions *to injure the Theatre and the community through costly litigation. Only the art and the community will suffer.* We know that is not your wish and that you are not selfish people.

CP at 83-85 (underlining in original) (emphasis added).

On October 24, 2010, James Ryan began posting negative statements about Yvonne Johnson on the Internet via a blog entitled "thetyrannyofyvonne." CP at 99. On April 29, 2011, Ryan began publishing adverse comments about Yvonne Johnson on the Internet via the domain names of "spokanecivictheater.org" and "spokanecivictheatre.org." CP at 99. James Ryan operated the blog "civicdoody.com." CP at 80. The blog could also be found at "thetyrannyofyvonne.blogspot.com." CP at 80. "Spokanecivictheater.org" and "spokanecivictheatre.org" redirected to "civicdoody.com." CP at 81.

The Spokane Civic Theatre filed a claim, with an Internet domain organization, against James Ryan, for use of his confusing website addresses. Ryan prevailed and kept his domain names.

Because we must determine if James Ryan's speech on his Internet blogs implicate a public concern, I quote much of the language from the postings. On July 5, 2011, Ryan posted the following blog that announced his prevailing in his claim for unemployment compensation and accused Yvonne Johnson of providing the Employment Security

6

Department with false information:

> TUESDAY, JULY 5, 2011
> **A Moral Victory**
> [PLEASE NOTE: This is obviously NOT the official site of Spokane Civic Theatre. That can be found at www.spokanecivictheatre.com. This site is here for the purpose of commentary and criticism. . . .
>
> After a six-week investigation, the State of Washington has found that Spokane Civic Theatre did not have sufficient cause to terminate my employment on the basis of misconduct of any kind. While this does nothing to improve my family's general situation, it is clearly a moral victory.
>
> Yvonne A.K Johnson was unable to document any of her allegations, as they were blatantly false to begin with. Moreover, she never conducted even a cursory investigation of the facts. Rather, she immediately capitulated to the outrageous demands of a criminal blackmailer on the basis of an anonymous email and proceeded to justify her actions after the fact. My official separation letter should be expunged from the record now that Ms. Johnson's lies and distortions have been revealed as such. Her handling of this situation has done irreparable harm to Spokane Civic Theatre and to her own ability to lead. She should resign her position immediately.
>
> . . . .
>
> If even one of Ms. Johnson's shocking and salacious allegations had been true, the Washington State Department of Unemployment would surely have found that my behavior showed "wanton disregard of the employer" or "disregard of standards of behavior which the employer has a right to expect." This is all very hard to square with the tone of my official separation letter, which says:
>
>> The Theatre could have and still can go down in financial flames because of what you have done. All of our hard work could be lost to public scandal and the Theatre could dwindle into obscurity. That is what you have done. That is the magnitude of the potential harm.
>
> Whether you are an actor, a staff member, a musician, a patron, or a board member, you now know that all of this could have been easily avoided by an honest and interpersonally competent executive. All of the drama, all of the negativity, all of the personal information you would rather have never learned—none of it had to become your problem. Ms. Johnson made it your problem.

The sad irony is that Yvonne A.K. Johnson could have avoided granting us this victory if her extraordinary intelligence had not been overwhelmed by her extreme maliciousness. This ruling is the result of her decision to fight my Washington State unemployment claim, which I filed in May, when my Pennsylvania benefits ran out. Washington found that I was eligible for about $3378, paid out at the rate of $198 per week, for as long as I remained unemployed, eligible for work, and actively seeking work.

If Ms. Johnson had been acting in the best interest of Spokane Civic Theatre, she would not have contested this claim. (If my calculations and understandings of the system are correct, the absolute most my claim will cost Civic is $202.68. That's 6% of the amount I am eligible for.) In the course of fighting my claim, Ms. Johnson submitted false statements to the Unemployment Security Department, in the form of my official separation letter. She had not previously provided this document to anyone other than myself. She has now opened the theatre to further charges of defamation, as well as to charges of making demonstrably false statements to a government agency, should Washington State wish to pursue that. She actually went out of her way to request additional time from the adjudicator, an indication that can only mean she put all of her best efforts into contesting my claim.

If Ms. Johnson had not been blinded by her determination to justify her mistakes, she would not have contested this claim, as in doing so she allowed for an adjudication of the circumstances surrounding my termination. That adjudication has shown, beyond a shadow of a doubt, that she has been in the wrong all along.

I can only assume that Johnson will drag this out further by appealing this ruling. If she does, a hearing will take place, creating further opportunity for her to make false statements on the record, opening Civic to further liability. I hope she will, as I have no doubt as to what the outcome of that process would be and I welcome the opportunity to vindicate myself again. I will wait until her window of opportunity to appeal has passed before I forward a version of this letter to local media outlets.

Finally, when board members fail to exercise the duties they accept when they agree to sit on boards, they must be publicly held to account. This is Civic's Board of Directors:

. . . .

An update will be posted here in the coming days regarding the status of our search for the attacker. Sadly, the one thing we've learned is that our best chance at catching and prosecuting him would have been for the theatre to have pressed blackmail charges immediately. As the theater

8

was too busy firing and defaming us, that obviously did not happen. We are still working on it though.

CP at 106-07.

In reaction to the July 5, 2011 post, Yvonne Johnson protested that she made no false statements to the Employment Security Department and that James Ryan knew she made no false statements. Spokane Civic Theatre Managing Director James Humes, not Yvonne Johnson, signed the Theatre's response to Ryan's application for unemployment benefits. Nevertheless, Johnson's termination letter was attached to the Theatre's response and represented as the reason for Ryan's firing.

In a declaration in opposition to James Ryan's anti-SLAPP motion, Yvonne Johnson testified that character, integrity and reputation are of the utmost importance to her position as executive artistic director of the Spokane Civic Theatre. The characteristics dictate her length of employment with the Civic Theatre and whether she can obtain similar employment elsewhere. Johnson expects to always work in the theater field.

Yvonne Johnson believes James Ryan seeks to prevent her from gaining employment in the theater world. In a November 14, 2011 blog Ryan wrote:

> MONDAY, NOVEMBER 14, 2011
> **A Couple Things You Should Know**
> . . . .
> If you are an employee of Spokane Civic Theatre, there are a couple of things you should know—a couple of things I haven't mentioned yet on this site:
> Firstly, you should know that in addition to the outright lies submitted to the State of Washington by Civic in my official separation

letter, there was also a standard questionnaire on which Civic checked a box indicating that I had been discharged for "**deliberate acts that are illegal, provoke violence or violations of the laws**." Throughout all of this, no one has ever indicated that I did anything illegal. Hell, the State of Washington found that I didn't even do anything negligent, let alone illegal. So I think it is important for you to know that your employer is brazen enough to cast such slanderous aspersions about their former employees— on official documents. They might even call you a criminal! This could obviously impact your future job prospects in undesirable ways.

. . . .

As I was writing this, it occurred to me that Civic is locked in a self-imposed catch-22. The longer the board fails to seek a resolution to this matter, the longer Civic is likely to be stuck with Yvonne A.K. Johnson. People have been talking for a year now about her desire to find a bigger, better job and move on from here—a scenario that has been fantasized about with no small amount of glee. If it is true that Ms. Johnson has been job hunting, one has to imagine that prospective employers have probably taken the time to Google Civic and her name. They are not likely to skip past the second search result, which is this site. (They might even just enter http://www.spokanecivictheatre.org, assuming that would be the correct domain.) A few minutes spent reading this and possibly clicking through to the recent UDRP [Uniform Domain Name Dispute Resolution] decision against Civic is likely to induce a sense that *Ms. Johnson would bring more drama and divisiveness than any respectable institution would care to have.* So any fantasies you may have that Civic will soon be free of Ms. Johnson of her own accord are probably a bit unrealistic.

Finally, I'd like to brag just a little by pointing out that of the 85 most recent UDRP decisions, the respondent prevailed in only SIX instances. That means that complainants win 93% of the time. That's how weak Civic's $3000 case against me was.

CP at 108 (bold and underlining in original) (emphasis added).

Yvonne Johnson characterizes James Ryan's blog attacks as a means to coerce a payment from the Spokane Civic Theatre. In the same February 8, 2013 blog, Ryan discussed a summary judgment ruling against him in a lawsuit he brought against the Civic Theatre for wrongful discharge from employment. Ryan wrote:

Ironically, this is likely a huge disappointment for Yvonne A.K. Johnson and Civic's Board of Directors. This was their best chance to make this go away without spending money. It was handled by their insurance company and had the potential to end this all with a settlement and a non-disclosure agreement. If I had to guess, Ms. Johnson praying against hope that they would write me a check and shut me up for good. So this has a silver lining.

CP at 100.

The blog also stated:

I must also mention that it has come to my attention that Yvonne A.K. Johnson used information obtained during the discovery phase of my suit to intimidate individuals cited in the documents I was legally obliged to provide.

CP at 100.

Yvonne Johnson denied intimidating witnesses, so James Ryan filed a declaration in this suit identifying the source of his information about intimidation. Before posting the February 8, 2013 blog, Troy Nickerson, a Spokane theater director, informed Ryan that Michelle Holland claimed she had been intimidated by Johnson. Ryan had identified Holland as a witness in his lawsuit against the Civic Theatre for wrongful discharge.

Michelle Holland, a former employee of the Spokane Civic Theatre, signed a declaration in support of James Ryan's anti-SLAPP motion. Holland knew that parties exchanged information in discovery in Ryan's lawsuit against the Theatre and that Ryan identified her as a witness in discovery. Yvonne Johnson approached Holland after this exchange of witnesses. Although Holland could not recall Johnson's statements verbatim, Johnson told Holland something along the lines of "'I don't know why you

11

Ironically, this is likely a huge disappointment for Yvonne A.K.
Johnson and Civic's Board of Directors. This was their best chance to
make this go away without spending money. It was handled by their
insurance company and had the potential to end this all with a settlement
and a non-disclosure agreement. If I had to guess, Ms. Johnson praying
against hope that they would write me a check and shut me up for good. So
this has a silver lining.

CP at 100.

The blog also stated:

I must also mention that it has come to my attention that Yvonne
A.K. Johnson used information obtained during the discovery phase of my
suit to intimidate individuals cited in the documents I was legally obliged to
provide.

CP at 100.

Yvonne Johnson denied intimidating witnesses, so James Ryan filed a declaration
in this suit identifying the source of his information about intimidation. Before posting
the February 8, 2013 blog, Troy Nickerson, a Spokane theater director, informed Ryan
that Michelle Holland claimed she had been intimidated by Johnson. Ryan had identified
Holland as a witness in his lawsuit against the Civic Theatre for wrongful discharge.

Michelle Holland, a former employee of the Spokane Civic Theatre, signed a
declaration in support of James Ryan's anti-SLAPP motion. Holland knew that parties
exchanged information in discovery in Ryan's lawsuit against the Theatre and that Ryan
identified her as a witness in discovery. Yvonne Johnson approached Holland after this
exchange of witnesses. Although Holland could not recall Johnson's statements
verbatim, Johnson told Holland something along the lines of "'I don't know why you

don't like me. I know several personal things about you that I do not go around telling people.'" CP at 130. Johnson then proceeded to list private personal things about Holland. Holland concluded that Johnson meant to intimidate her.

In a March 20, 2013, blog on Civic Doody, James Ryan wrote:

> Something Stinketh at Spokane Civic Theatre
> WEDNESDAY, MARCH 20, 2013
> **So Sue Me!**
> I'm torn. The truth is that I would love nothing more than for Ms. Johnson to file suit against me. I would absolutely love to see her flush a bunch of her own cash down the toilet only to be right back where she started once her frivolous claims are shut down by a judge or a jury. I would love to see her continue to deal with the consequences of her actions on a daily basis, as I do. I would love for her to remain as preternaturally fixated on my doings as I am on obtaining justice for what she did to us. But it just seems absurd. . .
> Yvonne A.K. Johnson and Civic have yet to initiate a successful action against me. They fought my Washington State unemployment claim and lost when the state found that no misconduct had occurred on my part. She and her "board of directors" threatened to sue me for trademark infringement and defamation but apparently didn't have anything to back up those claims because they never filed suit. They instead filed a UDRP complaint against me with the World Intellectual Property Forum (at a cost of several thousand dollars)—and they lost. Now Ms. Johnson is reiterating her absurd claim of defamation—which is really just another way of saying "I don't like the mean things you're saying about me!"— along with a new claim of tortious interference, this time through her personal attorney. If the goal has been to draw this out for as long as possible and garner lots of negative attention for the theatre, Ms. Johnson and her "board" have succeeded spectacularly.
> All doubt about the wrongness of Civic's actions was erased long ago. All anyone needs to know is this: Every other major theatre in the region has hired me since Civic fired me. Interplayers, Lake City Playhouse, Coeur d'Alene Summer Theatre, Gonzaga University, and others. All of these institutions saw no problem with the "offense" that was so terrible that Civic had to fire me two months after my family and I moved across the country and bought a house here. You'd think I'd be an untouchable after that, wouldn't you? I would be, if I had actually done

12

anything wrong. (Unfortunately, the combined wages from all of these short-term gigs has not come close to providing a wage that is comparable even to the meager salary I moved here for.)

So we can continue this saga for as long as Civic wants. I have tremendous patience. Occasionally, some well-meaning person will suggest that I'm "never going to get anything out of them," and that I should move on for my own well-being. I appreciate and understand the sentiment, but the truth is this: It has never once—not **once**—occurred to me that I will not get the justice I seek. It just hasn't. And so while I am grateful for the concern that motivates those suggestions, I cannot get past one simple, fundamental counter-argument: Why would I? I am objectively right. They are demonstrably wrong.

I was given ten days to cease and desist. That deadline passed last week, as I have no intention of doing any such thing. So sue me. . .

CP at 7.

According to James Ryan, he learned, after his termination from employment from the Spokane Civic Theatre, of a great breadth and depth of continuing frustration with leadership of the Theatre. He learned of widespread opinion that Yvonne Johnson's autocratic leadership style harmed both the volunteers at the Civic Theatre and the Spokane community as a whole.

James Ryan claims continuing involvement with Spokane area arts and entertainment. Since his termination from the Civic Theatre, Ryan has worked at all similar theaters in the region and has donated his services for fundraisers.

James Ryan insists that he only publishes, on his blogs, facts that he witnessed or confirmed through investigation and research. Ryan claims he does not publish rumors. He believes all factual statements on his blog to be true. As of May 24, 2013, James Ryan's blog had received over 36,000 hits.

13

PROCEDURE

Yvonne Johnson filed suit against James Ryan for intentional interference with business expectancy and defamation. Johnson sought damages and injunctive relief.

James Ryan brought a motion, pursuant to RCW 4.24.525, the anti-SLAPP statute, asking that the court strike Yvonne Johnson's complaint, award him $10,000 in damages under the statute, and award him reasonable attorney fees and costs. In his anti-SLAPP motion, Ryan argued that his online postings intended to provide a public forum for discussion and dissemination of commentary, complaints, and information related to the Spokane Civic Theatre. He asserted that his online cyber-conduct addressed matters of public concern as evidenced by the amount of Internet traffic to his blogs.

The Spokane County Superior Court granted James Ryan's anti-SLAPP motion after concluding that Ryan's online blogging activity addressed a matter of public concern. The trial court also concluded that Yvonne Johnson did not show a probability that she would prevail on either her tortious interference with business expectancy or defamation claims.

On appeal, Yvonne Johnson contends the trial court erroneously classified Ryan's statements as statements of "public concern" for purposes of the anti-SLAPP statute. Johnson characterizes Ryan's attacks on her as a "wholly private" employment dispute between a disgruntled ex-employee and his supervisor. In so arguing, Johnson

14

emphasizes blogs, in which Ryan discusses his goal to obtain vengeance and money from the Spokane Civic Theatre.

## LAW AND ANALYSIS

*Washington Anti-SLAPP Statute*

The majority has outlined the provisions of and background to the 2010 Act Limiting Strategic Lawsuits Against Public Participation. LAWS OF 2010, ch. 118, § 4. The legislature directed the courts to liberally interpret the Act. *Akrie v. Grant*, 178 Wn. App. 506, 315 P.3d 567 (2013), *review granted*, 180 Wn.2d 1008, 325 P.3d 913 (2014). "This act shall be applied and construed liberally to effectuate its general purpose of protecting participants in public controversies from an abusive use of the courts." LAWS OF 2010, ch. 118, § 3.

Because of its length, RCW 4.24.525, the anti-SLAPP statute, requires a scorecard to review. In order to understand the substance of the statute, one must refer to definitions of words found at the statute's beginning. RCW 4.24.525(4)(a) allows a party to bring a special motion to strike a claim that is based on an "action involving public participation and petition." Section 2 identifies the communications protected by the statute, most of which communications are directed to the government. Nevertheless, the statute also protects free speech in other contexts. The statute reads, in relevant part:

> (2) This section applies to any claim, however characterized, that is based on an action involving public participation and petition. As used in this section, an "action involving public participation and petition" includes:
>
> . . . .

(d) Any *oral statement made, or written statement* or other document submitted, *in a place open to the public or a public forum in connection with an issue of public concern*; or

(e) *Any other lawful conduct* in furtherance of *the exercise of the constitutional right of free speech in connection with an issue of public concern.*

RCW 4.24.525 (emphasis added).

Note that the statute uses "in connection with an issue of public concern" in two settings: (1) when the defendant renders a statement on an issue of public concern in a place open to the public or in a public forum, (subsection (d)), and; (2) when the defendant engages in conduct in connection with an issue of public concern while exercising his constitutional right of free speech, (subsection (e)). The majority and I focus on subsection (d).

The majority concedes that James Ryan wrote the subject statements on the Internet and that the Internet is a public forum. *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 113 Cal. Rptr. 2d 625 (2001). The crux of the appeal therefore becomes whether Ryan uttered a statement "in connection with an issue of public concern." This court must wrestle with the amorphous clause "in connection with an issue of public concern" and decide whether James Ryan's computer-generated fulminating falls within the scope of the fluid phrase. Because of the flexibility of the critical term, I extensively explore definitions, Washington case law, and foreign law to seek an answer.

"The court's duty in statutory interpretation is to discern and implement the legislature's intent." *Lowy v. PeaceHealth*, 174 Wn.2d 769, 779, 280 P.3d 1078 (2012).

16

To determine legislative intent, this court looks first to the language of the statute. *Lacey Nursing Ctr., Inc. v. Dep't of Revenue*, 128 Wn.2d 40, 53, 905 P.2d 338 (1995). Both the majority and I find no help in the language alone of the statute to solve this appeal. Thus, I look to the liberal construction rule, dictionary definitions, and prior case law in resolving the question on appeal.

No case addresses whether portions of a defendant's targeted statement or statements involve a public concern, while other portions of the statements do not. In other words, courts do not separate the chaff from the wheat. Winning and losing is an all or nothing proposition.

### In Connection With

All anti-SLAPP decisions omit analyzing the prepositional phrase "in connection with" that precedes the expression "issue of public concern" in RCW 4.24.525. *Merriam-Webster's Third New International Dictionary* variously defines the idiomatic phrase as the act of connecting, a casual or logical relation or sequence, contextual relationship, or association. Use of the phrase may suggest that speech protected by the anti-SLAPP statute need not directly be of public concern, as long as there is some relevant connection between the speech and a subject of public concern.

One California decision mentions that shielded speech need only have "some attributes" of "public interest." *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132, 2 Cal. Rptr. 3d 385 (2003). The United States Supreme Court and our court, in First Amendment cases, have noted that even the slightest tinge of "public concern" is

sufficient to satisfy the element of "public concern." *Connick v. Myers*, 461 U.S. 138, 147-49, 103 S. Ct. 1684, 75 L. Ed. 2d 708 (1983); *Binkley v. City of Tacoma*, 114 Wn.2d 373, 383 n.8, 787 P.2d 1366 (1990).

This court's majority contradicts the precedents of *Connick* and *Binkley* when writing: "In *Dillon* [*v. Seattle Deposition Reporters, LLC.*, 179 Wn. App. 41, 316 P.3d 1119, *review granted*, 180 Wn.2d 1009, 325 P.3d 913 (2014)], we find further support for the proposition that speech that only tangentially implicates a public issue is not a matter of public concern." Majority at 18. Our recent decision in *Dillon* does not support this proposition. The majority cites the *Dillon* passage: "'[I]t is the *principal thrust or gravamen* of the plaintiff's cause of action that determines whether the anti-SLAPP statute applies and when the allegations referring to arguably protected activity are only incidental to a cause of action based essentially on nonprotected activity, collateral allusions to protected activity should not subject the cause of action to the anti-SLAPP statute.'" *Dillon*, 179 Wn. App. at 72 (quoting *Martinez v. Metabolife Int'l, Inc.*, 113 Cal. App. 4th 181, 188, 6 Cal. Rptr. 3d 494 (2003)). The majority fails to note that *Dillon* borrowed this quote from the California decision *Martinez*. More importantly, the "gravamen" to which this passage refers is the gist of the legal claims, allegations, and causes of action of the plaintiff, not the gist of the speech for which the defendant is sued. In *Dillon*, the gravamen of the plaintiff's complaint was the defendants' recording of a conversation without plaintiff's permission rather than the content of speech.

18

*Dictionary Definitions of Public Concern*

The anti-SLAPP statute does not define what constitutes an "issue of public concern." Undefined statutory terms must be given their usual and ordinary meaning. *Dominick v. Christensen*, 87 Wn.2d 25, 27, 548 P.2d 541 (1976); *Nationwide Ins. v. Williams*, 71 Wn. App. 336, 342, 858 P.2d 516 (1993).

*Black's Law Dictionary* does not define either "public concern" or "concern." *Black's* defines "public interest," in relevant part, as: "Something in which the public as a whole has a stake." BLACK'S LAW DICTIONARY 1425 (10th ed. 2014). The same dictionary defines "interest," in part as "[t]he object of any human desire." BLACK'S, *supra*, at 934. A lay dictionary defines concern, in part, as a marked interest or regard and a matter for consideration.

These dictionary definitions provide little assistance in answering our question other than to suggest that the public as a whole must be interested in the subject matter. I assume not every member of the public need be interested in a subject of public concern, since no topic captures the attention or concern of every person. The interest of a significant number of citizens is sufficient. The definitions do not distinguish between the public holding a legitimate interest in the issue or if a prurient or sensational interest suffices for protection.

I include in the list of dictionary definitions the phrase "public interest." The dictionary definitions suggest that the phrases "public concern" and "public interest" are synonymous. I will analyze this implication later.

19

*Washington Case Law on Public Concern*

Division One of this court, in several current decisions, has boldly gone before us in addressing the meaning of "public concern" under Washington's anti-SLAPP statute. The prior decisions give both a broad definition and then explore factors to consider when deciding whether speech contains matters of public concern. Under the broad definition, speech deals with matters of "public concern" when it can "'be fairly considered as relating to any matter of political, social, or other concern to the community.'" *Spratt v. Toft*, 180 Wn. App. 620, 632, 324 P.3d 707 (2014); *Davis v. Cox*, 180 Wn. App. 514, 531, 325 P.3d 255 (2014) (quoting *Snyder v. Phelps*, 562 U.S. 443, 131 S. Ct. 1207, 1216, 179 L. Ed. 2d 172 (2011)). Use of factors may arise from the difficulty in forming a comprehensive and workable definition of "public concern." The term "public concern" does not lend itself to a precise, all-encompassing definition. *Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. 591, 599, 323 P.3d 1082 (2014) (quoting No. 2:13-CV-00116, 2013 WL 4853333, at *5, 2013 U.S. Dist. LEXIS 129204, at *16 (E.D. Cal. Sept. 10, 2013)). "'The boundaries of the public concern test are not well defined.'" *Snyder*, 131 S. Ct. at 1216 (quoting *City of San Diego v. Roe*, 543 U.S. 77, 83, 125 S. Ct. 521, 160 L. Ed. 2d 410 (2004)). Because the legislature's intent in adopting RCW 4.24.525 was to address lawsuits brought primarily to chill the valid exercise of the constitutional rights of freedom of speech and petition for the redress of grievances, this court looks to First Amendment cases to aid in its interpretation. *Davis*, 180 Wn. App. at 530; *City of Seattle v. Egan*, 179 Wn. App. 333, 338, 317 P.3d 568

20

(2014) (quoting LAWS OF 2010, ch. 118, § 1(1)(a)).

*Alaska Structures v. Hedlund*, 180 Wn. App. 591 (2014) presents the fullest analysis of the phrase "public concern." The *Hedlund* court employed the California decision, *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO*, 105 Cal. App. 4th 913, 924, 130 Cal. Rptr. 2d 81 (2003), for outlining a series of categories for determining whether a statement implicates an issue of public interest and falls within the protection of the anti-SLAPP statute. *Hedlund*, 180 Wn. App. at 599-600. The first category comprises instances when the statement was of "a person or entity in the public eye." The second category comprises circumstances when the statement "involved conduct that could affect a large number of people beyond the direct participants." A third category comprises situations when the statement entailed "a topic of widespread, public interest."

The *Hedlund* court also quoted from *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132, 2 Cal. Rptr. 3d 385 (2003), when sketching relevant factors for determining an issue of public concern or public interest. Public interest does not equate with mere curiosity. A matter of public interest should be something of concern to a substantial number of people. A matter of concern to the speaker and a relatively small, specific audience is not a matter of public interest. There should be some degree of closeness between the challenged statements and the asserted public interest. The assertion of a broad and amorphous public interest is not sufficient. The focus of the speaker's conduct should be the public interest rather than a mere effort to gather ammunition for another

21

round of private controversy. Those charged with defamation cannot make their target into a public figure. *Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. at 602-03.

In a defamation case, this court explored the meaning of "public concern" in the context of a news story about a lawsuit brought by Microsoft for software piracy.

> Whether an allegedly defamatory statement pertains to a matter of public concern depends on the content, form, and context of the statement as shown by the entire record. Here, the challenged story relates to a court decision resolving an intellectual property dispute between a major software manufacturer and a local retailer. Viewed narrowly, the story pertains to a private dispute between two business entities. In a broader context, however, the dispute touches on a matter of public importance, software piracy. The public concern is heightened by the fact that Alpine apparently sold counterfeit software to the general consumer. In an age where the use of personal computers is widespread, the retail distribution of pirated software is a matter of acute importance to general consumers. This is a matter where the First Amendment plays a role in ensuring the free flow of information to the public. Accordingly, the *Dun & Bradstreet[, Inc. v. Greenmoss Builders, Inc.*, 472 U.S. 749, 105 S. Ct. 2939, 86 L. Ed. 2d 593 (1985)] factors indicate the Alpine case was a matter of public concern deserving of heightened protection.

*Alpine Indus. Computers, Inc. v. Cowles Publ'g Co.*, 114 Wn. App. 371, 393-94, 57 P.3d 1178 (2002) (citation omitted). The decision illustrates that a private dispute and a lawsuit may be of public concern.

The majority relies on *Tyner v. Department of Social & Health Services* (DSHS), 137 Wn. App. 545, 154 P.3d 920 (2007) for concluding that James Ryan's speech was not in connection with an issue of public concern. DSHS discharged Paula Tyner as part of a reduction in force, but subsequently reassigned her to a different position. She sued claiming DSHS reassigned her in retaliation for her exercising free speech rights. *Tyner*

lacks a correlation to anti-SLAPP law, because of the unique test employed when determining whether the government violates an employee's free speech rights when discharging or demoting a government employee after the employee criticizes the employer. The court balances the employee's interest with the interest of the government in promoting the efficiency of the public services. The government has legitimate interests in regulating the speech of its employees that differ significantly from its interest in regulating the speech of people generally. *Binkley v. City of Tacoma*, 114 Wn.2d 373, 381-82, 787 P.2d 1366 (1990).

More importantly, the *Tyner* court noted that speech on the job generally is not a matter of public concern because the speech is not disseminated to the public. Paula Tyner's communication occurred in the work setting. The court held that "a comment addressed solely to an internal audience without any intent to bring it to the public's attention does not constitute a matter of public concern." 137 Wn. App. at 558. Our majority ignores this holding. James Ryan wrote his blog after being discharged from employment and he disseminated his comments to the Spokane public, if not the universal public. According to Ryan's unchallenged testimony his blogs received over 36,000 hits. James Ryan was no longer employed when he posted his blogs.

The majority discusses at length *White v. State*, 131 Wn.2d 1, 929 P.2d 396 (1997). Judy White, an employee at a state nursing home, alleged the State transferred her to a new position, in violation of her First Amendment rights, in retaliation for reporting patient abuse. The court held: "The fact that White may have had a personal

23

interest in reporting the incident does not diminish the concern the public would have in this matter." 131 Wn.2d at 13. The court held White's speech to be a matter of public concern. The court dismissed the suit, however, because White failed to establish a causal connection between her transfer and her protected speech. The *White* decision supports a ruling in favor of James Ryan.

We should apply the anti-SLAPP statute liberally and provide protection to a speaker if his speech has the slightest shade of public concern. Even ignoring these two guidelines, the factors and categories outlined in *Hedlund* compel a conclusion that James Ryan's speech, for which Yvonne Johnson sues, embraces an issue of public concern.

When ruling that James Ryan's writings lie outside the protection of Washington's anti-SLAPP statute, the majority cherry picks a few sentences of Ryan's prose, omits a review of the complete blogs, and ignores the backgrounds of the Spokane Civic Theatre and Yvonne Johnson. Spokane's leading newspaper quoted Johnson as a gift to the community, who enabled the Spokane Civic Theatre to regain its standards as a glorious and reliable area theater. Johnson was the Civic Theatre's face to the Spokane public and other arts organizations. The Civic Theatre fired Ryan because he did not fulfill "high public standards charged to representatives of the Theatre." CP at 84. According to Yvonne Johnson, Ryan's actions were "public actions" that must satisfy the Theatre's diverse community. Because the Spokane Civic Theatre depends on the goodwill of the greater Spokane metropolitan area, Ryan's conduct exposed the Theatre to "public scandal" and oblivion. According to Johnson, the Civic Theatre is a vanguard of the

24

dramatic arts in Spokane that must push the boundaries of creativity and expression for the betterment of the community. Art is considered a matter of public concern. *United States v. Alvarez*, __ U.S. __, 132 S. Ct. 2537, 2564, 183 L. Ed. 2d 574 (2012); *State v. Crawley*, 819 N.W.2d 94, 124 (Minn. 2012).

The following is a paraphrased list of comments uttered by James Ryan in his blogs:

Yvonne Johnson capitulated to an extortionist but took no steps to learn the identity of the extortionist.

The Spokane Civic Theatre, through Yvonne Johnson, wrongly challenged my application for unemployment compensation.

Yvonne Johnson filed false allegations with the Department of Employment Security.

Yvonne Johnson falsely accused me of exposing the Spokane Civic Theatre to public scandal and obscurity.

The Spokane Civic Theatre uttered lies before the Department of Employment Security.

The Spokane Civic Theatre falsely accused me, in the Employment Security proceeding of deliberate illegal acts and provoking violence.

The Spokane Civic Theatre cast slanderous aspersions against a former employee in a government proceeding.

I prevailed in my unemployment compensation claim.

Yvonne Johnson is not an honest and interpersonally competent executive.

Yvonne Johnson caused undue drama in the drama department.

Yvonne Johnson is malicious.

Yvonne Johnson does not act in the best interest of the Spokane Civic Theatre.

Yvonne Johnson exposed the Spokane Civic Theatre to a defamation claim.

Johnson caused irreparable harm to the Spokane Civic Theatre.

Yvonne Johnson and the Board of the Spokane Civic Theatre are bringing negative attention to the Theatre.

Johnson should resign as Executive Artistic Director of the Spokane Civic Theatre.

Yvonne Johnson and the Board of Directors of the Spokane Civic

Theatre should be publicly held accountable.

Yvonne Johnson seeks to leave the Spokane Civic Theatre to find a better and bigger job.

Yvonne Johnson will bring drama and divisiveness to any new employer.

Potential employers of Yvonne Johnson should contact me.

Few defendants win in claims brought, in front of a Uniform Domain Name Dispute Resolution Policy panel, for violating a right to a domain name, but I won on a claim brought by the Spokane Civic Theatre.

Yvonne Johnson and the Board of the Spokane Civic Theatre wasted several thousand dollars of Theatre money by suing me for domain name infringement.

I lost my wrongful discharge suit against the Spokane Civic Theatre, which is a disappointment to Yvonne Johnson since my winning the suit would have satisfied my desire for payment.

Because of the dismissal of the wrongful discharge case, the Spokane Civic Theatre must pay serious money to settle my claims.

Yvonne Johnson intimidated a witness in my wrongful discharge suit.

Yvonne Johnson threatens to sue me for defamation and tortious interference.

The deadline imposed by Yvonne Johnson for suing has passed without my responding.

Yvonne Johnson can sue me.

All other major theatres in the Inland Empire have hired me since my firing from the Spokane Civic Theatre.

Well meaning people tell me that I will receive no money from the Spokane Civic Theatre.

I am right and the Spokane Civic Theatre is wrong.

I will receive justice.

I will not end my campaign to hold Yvonne Johnson accountable.

In one or two paragraphs of his several blogs, James Ryan discusses his desire to receive vindication and compensation. The overwhelming discussion, however, is of the mismanagement of the Spokane Civic Theatre by Yvonne Johnson and its board of directors. The management of the Theatre impacts many Inland Empirites, not only

26

James Ryan and Yvonne Johnson. At least one thousand volunteers and donors assist the Civic Theatre. More attend Theatre productions.

The public should know if Yvonne Johnson mismanages the Spokane Civic Theatre. The public should also know if Johnson is wasting money on litigation, lying to government entities, and intimidating a witness. James Ryan is engaged in a controversy with Yvonne Johnson, but his blogs have not sought ammunition to assist in the litigation. Johnson and the Spokane Civic Theatre were already in the public eye before they fired James Ryan.

A consideration of the relief sought by the party asserting the cause of action can be a determinative factor when resolving the question of whether speech is of a public concern for purposes of the anti-SLAPP statute. *Davis v. Cox*, 180 Wn. App. 514, 523, 325 P.3d 255 (2014). A prayer for injunctive relief to preclude the defendant from speaking is a factor favoring granting an anti-SLAPP motion to strike. *Davis*, 180 Wn. App. at 523. Yvonne Johnson seeks injunctive relief against James Ryan for continuing to post blogs. She seeks a prior restraint on James Ryan's First Amendment rights.

*California Case Law on Public Concern*

Washington decisions alone compel a ruling in favor of James Ryan. Nevertheless, I believe California anti-SLAPP decisions bolster the conclusion that Ryan uttered speech in connection with an issue of public concern. Therefore, I address whether a Washington court may rely on California decisions.

27

The majority emphasizes that the California anti-SLAPP statute uses the phrase "public interest," whereas the Washington statute employs the term "public concern." In turn, the majority applies the principle of statutory construction that, if our legislature modifies a provision of the borrowed statute, the legislature rejects the case law decided under the contrary language in the borrowed statute. The majority, however, fails to explain the difference between "public concern" and "public interest." The majority withholds enlightenment as to the practical implications between distinguishing between a subject of public interest and a topic of public concern. The majority provides no example as to a different outcome depending which phrase is used, nor does it address whether there would be a different outcome in this appeal under the California statute.

The majority, upon noting the difference in the wording between the Washington and California statutes, implies that Washington courts should not rely on California decisions because the California statutory language covers more subjects and affords the speaker greater protection than Washington's statutory language. Nevertheless, we do not know why the Washington Legislature changed the statutory language from "public interest" to "public concern." The Act's legislative history reveals nothing to explain this deviation from the California statute. Tom Wyrwich, *A Cure for a "Public Concern": Washington's New Anti-SLAPP Law*, 86 WASH. L. REV. 663, 684-85 (2011). We do not know if the Washington Legislature concluded that the California anti-SLAPP statute was too broad. For all we know, the opposite is true—that the Washington Legislature thought "public concern" covered more subjects and provided the speaker greater

protection than California's phrase of "public interest." If this is true, California decisions, to the extent they protect the defendants' speech, are helpful because the Washington statute covers at least the subjects covered by the California statute. Since the Washington Legislature wanted the Washington anti-SLAPP statute applied liberally, we should conclude that the Washington statute provides the same protections, if not more protection, than the California statute.

A possible explanation for the difference between the California and Washington statutes is the Washington Legislature's desire for courts to employ First Amendment decisions when construing the anti-SLAPP statute because First Amendment decisions use the expression "public concern." Wyrwich, *supra*, at 685. This explanation falls short, however, since California cases also look to First Amendment cases when applying its anti-SLAPP statute. *Weinberg v. Feisel*, 110 Cal. App. 4th 1122, 1132, 2 Cal. Rptr. 3d 385 (2003).

Contrary to the majority's position, Washington courts look to California decisions in answering questions posed by the anti-SLAPP statute. *Spratt v. Toft*, 180 Wn. App. 620, 630-31, 324 P.3d 707 (2014); *Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. 591, 602-03, 323 P.3d 1082 (2014). Washington courts have never held that California decisions addressing the nature of "public interest" are inapposite when addressing the nature of "public concern." To the contrary, the *Hedlund* court cited and used fifteen California cases when exploring the extent of "an issue of public concern." *Alaska Structures, Inc. v. Hedlund*, 180 Wn. App. at 599-603. Our majority even

includes a quote from the California decision of *Weinberg* in construing the meaning of "public concern," despite earlier proclaiming to disown California case law. Majority at 13-14.

The majority also uses California law when it erroneously claims that speech that only tangentially implicates a public issue is not a matter of public concern. Majority at 18. The majority cites *Dillon v. Seattle Deposition Reporters*, 179 Wn. App. at 72 (2014) for the misplaced proposition, but the *Dillon* language comes from *Martinez v. Metabolife International, Inc.*, 113 Cal. App. 4th 181, 188, 6 Cal. Rptr. 3d 494 (2003). The majority cites California decisions when California law suits its purposes.

In another setting, the Washington Supreme Court used the terms public "interest" and "concern" interchangeably. *See Taskett* v. *KING Broadcasting Co.*, 86 Wn.2d 439, 440, 442, 444, 546 P.2d 81 (1976). In her briefing, Yvonne Johnson relies on California cases when arguing what constitutes an issue of "public concern." In short, we should look to California decisions when deciding if a defendant's statements deserve protection under the Washington anti-SLAPP statute. Although the Washington statute and case law is sufficient to hold James Ryan's speech of public concern, California cases bolster this conclusion.

Based on the three categories found in *Rivero v. American Federation of State, County, and Municipal Employees, AFL-CIO*, 105 Cal. App. 4th 913, 130 Cal. Rptr. 2d 81 (2003), California cases hold that consumer information posted on web sites concern issues of public interest. *Makaeff v. Trump Univ., LLC*, 715 F.3d 254, 262 (9th Cir.

2013) (applying California law); *Wong v. Tai Jing*, 189 Cal. App. 4th 1354, 117 Cal.

Rptr. 3d 747 (2010); *Gilbert v. Sykes*, 147 Cal. App. 4th 13, 23, 53 Cal. Rptr. 3d 752

(2007). In *Gilbert*, the court held a patient's statements about a plastic surgeon were of

public interest because the information provided was material to potential consumers

"contemplating plastic surgery." In *Wong*, a review on Yelp.com criticizing dental

services and discussing the use of silver amalgam, raised issues of public interest. The

Ninth Circuit Court of Appeals, in *Makaeff*, held that statements warning consumers of

fraudulent or deceptive business practices constitute a topic of widespread public interest,

so long as they are provided in the context of information helpful to consumers.

Although theatergoers may not be characterized as consumers, they are customers

or patrons of the arts. Providing them information on the management of the Spokane

Civic Theatre should be a matter of public concern.

Other California decisions stand for additional propositions. Even purely private

speech may be covered by an anti-SLAPP statute if it concerns a public issue. *Averill v.

Superior Court*, 42 Cal. App. 4th 1170, 1174, 50 Cal. Rptr. 2d 62 (1996). The creative

process underlying the production of arts and entertainment is a matter of public concern.

*Tamkin v. CBS Broadcasting, Inc.*, 193 Cal. App. 4th 133, 143-44, 122 Cal. Rptr. 3d 264

(2011). Unflattering speech by a former employee about working conditions at a private

company is an issue of public interest when the company and its founder spent a great

deal of money and effort to promote the business. *Nygard, Inc. v. Timo Uusi-Kerttula*,

159 Cal. App. 4th 1027, 1033, 1042, 72 Cal. Rptr. 3d 210 (2008). Unflattering speech on

31

a "Rants and Raves" website by a former employee about a private bank's management decisions was a public issue when the bank actively promoted itself as a "community partner" and its chief executive officer had been the subject of media attention. *Summit Bank v Rogers*, 206 Cal. App. 4th 669, 694, 142 Cal. Rptr. 3d 40 (2012). Under the California anti-SLAPP statute, statements held to involve issues of public interest include criticism of the management of a publicly traded company. *ComputerXpress, Inc. v. Jackson*, 93 Cal. App. 4th 993, 1007-08, 113 Cal. Rptr. 2d 625 (2001); *Global Telemedia Int'l, Inc. v. Doe*, 132 F. Supp. 2d 1261 (C.D. Cal. 2001). Examples of matters of public interest may include activities of private entities that may impact the lives of many individuals. *Church of Scientology v. Wollersheim*, 42 Cal. App. 4th 628, 650, 49 Cal. Rptr. 2d 620 (1996).

A California court also held criticism of the manager of a homeowners association to be a matter of public interest. *Damon v. Ocean Hills Journalism Club*, 85 Cal. App. 4th 468, 479, 102 Cal. Rptr. 2d 205 (2000). In the latter case, the management and welfare of a large residential community was a matter of public interest. The *Damon* court noted the mandate to broadly construe the anti-SLAPP statute. The anti-SLAPP statute applies regardless of whether the "primary purpose" of the lawsuit is to vindicate the damage done to plaintiff's reputation and not to interfere with the defendant's exercise of his free speech rights.

Another case helpful to James Ryan is *Averill v. Superior Court*, 42 Cal. App. 4th 1170, 50 Cal. Rptr. 2d 62 (1996). A charitable organization sued Averill after she made

allegedly slanderous remarks about the organization to her employer. The employer was supporting the organization's home for battered women, which Averill publicly opposed. Even though Averill's remarks were made in a private setting, the court held the suit subject to the anti-SLAPP statute. The court stressed the fact that, while the remarks were private, the subject of the remarks—the home for battered women—was a topic of considerable public controversy.

Yvonne Johnson emphasizes that the Spokane Civic Theatre is not a government entity and she argues that she is not a public figure. Johnson ignores, however, that the Theatre operates by the help of one thousand volunteers and with donations from throughout the Spokane community. Thus, thousands of Spokanites hold concern about the operation of the Spokane Civic Theatre. *Averill* stands for the proposition that a nonprofit organization can be a matter of public interest and criticism of the organization can be protected by an anti-SLAPP statute.

*Motivation of James Ryan*

Yvonne Johnson characterizes James Ryan's comments as an attempt to coerce, through slander, a monetary settlement from the Spokane Civic Theatre or herself. Based on this characterization, Johnson argues that the anti-SLAPP statute does not apply because Ryan seeks to further only personal, financial interests. She contends a defendant in an ordinary private dispute cannot take advantage of the anti-SLAPP statute simply because the complaint contains some references to speech or petitioning activity by the defendant, citing *Dillon v. Seattle Deposition Reporters, LLC*, 179 Wn. App. 41,

33

71, 316 P.3d 1119, *review granted*, 180 Wn.2d 1009, 325 P.3d 913 (2014).

The majority accepts Yvonne Johnson's portrayal of James Ryan's speech. The majority summarizes James Ryan's speech as: Johnson wrongfully terminated me; she caused me financial damages and embarrassment; I will cause her financial damages and embarrassment. The majority characterizes these thoughts as the "dominant themes" of Ryan's writings. I am nonplused as to how the majority assesses the "dominant theme" of James Ryan's cyber chatter. A reading of the blogs as a whole shows one of the dominant themes to be the mismanagement of the Spokane Civic Theatre. The statute requires a "connection" to public concern not that this concern be the primary motive. Ryan's repeated discussion of the Theatre's mismanagement provides this connection.

I recognize portions of James Ryan's blogs indirectly seek a financial settlement. I agree with the majority that James Ryan is obsessed with vengeance. I concede that Ryan's attacks on Johnson are unfair. For these reasons, James Ryan is not a sympathetic defendant, but an undesirable defendant needs the protection afforded by the anti-SLAPP statute more than does an attractive defendant.

Even if coercion and vengeance were the prime motivation of James Ryan, the anti-SLAPP statute does not exclude speech from its protection if the speaker seeks to gain money, as long as the content of the speech is a matter of public concern. A fixation with revenge does not automatically close the door to a determination that the writing is of public concern. No language in RCW 4.24.525 excludes, from the statute's shield, speech motivated by greed or revenge. No case law supports such a contention.

34

Some of the world's finest literature addressing a topic of public and grave concern was written in a spiteful spirit. A prime example is Ida Tarbell's *History of the Standard Oil Company*, which depicts John D. Rockefeller, Sr., as a crabbed, miserly, greedy monopolist. Tarbell penned the book from enmity and vengeance resulting from Rockefeller's ruthless tactics that put her father out of the oil business. New York University listed the book as number five on a 1999 list of the top 100 works of twentieth century journalism.

Yvonne Johnson was in the public eye as a result of her leading position with a cherished community theater and newspaper articles praising her performance. One in the public eye soon learns that unfair attacks often follow public praise. The remedy for verbal abuse, however, is not found in a lawsuit. Johnson should find some consolation that many readers find James Ryan's blogs obsessive, boorish, and foolish. Also, a court's ruling or this dissenter's vote for protection of speech does not denote approval of the speech. Whether hyperbolic or sensational, the speech at issue in this case bears a connection to an issue of public concern: Spokane's Civic Theatre and its management.

*Probability of Johnson Prevailing on Claims*

The anti-SLAPP motion procedure statute dictates that, after the moving party has shown that the claims at issue seek to impose liability for statements "in connection with an issue of public concern," "the burden shifts to the responding party to establish by clear and convincing evidence a probability of prevailing on the claim." RCW 4.24.525(2)(d), (4)(b). The majority does not address whether Yvonne Johnson

35

meets this burden, since the majority rules that James Ryan has not shown his speech involved a matter of public concern. In the public interest of brevity and being motivated by public concern, I will also refrain from analyzing this question in detail. I agree with the trial court that Johnson did not meet her burden.

*Concurring Opinion*

Although the concurring opinion does not seek to base the majority's decision on the Washington Constitution, the opinion mentions article I, section 5 of the Washington Constitution that demands that a speaker be responsible for the abuse of the right to freely speak and write. Yvonne Johnson has not asserted this internally inconsistent constitutional provision as a basis for relief. Johnson quoted the provision in the introduction to her reply brief, but did not discuss its application to her claims. Under RAP 12.1(a), this reviewing court decides a case only on the basis of issues forwarded by the parties in their briefs.

CONCLUSION

The 2010 anti-SLAPP statute, RCW 4.24.525, immunizes James Ryan from the tort claims of Yvonne Johnson. The trial court's dismissal of Johnson's complaint should be affirmed.

_____
Fearing, J.